**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DAMON WILLIS, CALVIN
MATLOCK, HAROLD WILLIAMS,
DAVE L. TAFT, JR., PAUL HUSTON,
SYVENO WRIGHT, EDDIE C.
RISDAL, DONALD E. PHILLIPS and
MICHAEL MILLSAP,

        Plaintiffs,

vs.

CHARLES PALMER, JASON SMITH,
MATTHEW ROYSTER, BOB STOUT,
BILL TURNER, STEVE TJADEN and
MIKE LOESCHER,

        Defendants.

No. C12-4086-MWB
(Lead Case)

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

I.    **INTRODUCTION**........................................................3
    *A.    Procedural History* ...............................................3
    *B.    Factual Findings*.................................................5
        *1.    Civil commitment generally* ...............................5
        *2.    The treatment process* .................................. 10
        *3.    Defendants*............................................. 14
        *4.    Defendants' deposition testimony* ....................... 16
        *5.    Plaintiffs* ............................................. 18
        *6.    Relief* ................................................. 23

II.   **LEGAL ANALYSIS** ................................................ 23
    *A.    Issues*.......................................................... 23
    *B.    Summary Judgment Standard*.................................. 24
    *C.    **Younger** Abstention*........................................... 26
        *1.    Standard*............................................... 26
        *2.    Analysis* ............................................... 27

D.  **Colorado River** *Abstention* .................................................... *30*
    *1.*   *Standard* ................................................................... *30*
    *2.*   *Analysis* .................................................................... *31*
E.  **Heck v. Humprey** ............................................................. *33*
    *1.*   *The standard* ........................................................... *33*
    *2.*   *Analysis* .................................................................... *33*
F.  *Is CCUSO Constitutional?* .................................................... *39*
    *1.*   *Treatment program* ................................................... *39*
    *2.*   *Punitive as applied* ................................................... *46*
    *3.*   *Least restrictive alternative* ........................................ *49*
G.  *Qualified Immunity* ............................................................ *50*
H.  *Personal Responsibility* ....................................................... *52*
I.  *Contract Claims* ................................................................ *53*
J.  *Money Damages* ................................................................ *54*

III.    *CONCLUSION* .......................................................... *55*

"Relax," said the night man,
"We are programmed to receive.
You can check-out any time you like,
But you can never leave!"[1]

Like the unlucky guest at the eponymous hotel, the plaintiffs, long-term patients at the Civil Commitment Unit for Sexual Offenders (CCUSO) in Cherokee, Iowa, filed this lawsuit arguing that their constitutional rights have been violated because defendants

---

[1] Don Felder, Glenn Frey, and Don Henley (The Eagles), *Hotel California*, Hotel California, Asylum Records, (1977).

have created a treatment system where the plaintiffs may check-out anytime they want, but they may never leave.

## I.     INTRODUCTION
### A.     *Procedural History*

Currently before me is a motion for summary judgment, filed by the defendants, requesting that I dismiss plaintiffs' 42 U.S.C. § 1983 lawsuit. (docket no. 71). In their motion for summary judgment, the defendants rely on various legal doctrines to argue that plaintiffs' confinement comports with constitutional standards and their current federal claims are barred.

The patients at CCUSO are former inmates who were prosecuted by the State of Iowa for sex crimes. They have served their prison terms but, in a separate civil trial, have been found likely to commit further violent sexual offenses. Pursuant to that finding, the State of Iowa committed the plaintiffs (and other CCUSO residents) to civil confinement at the state hospital in Cherokee. Patients at CCUSO can be released if they complete treatment or if they are released by the state court that originally committed them. This will be discussed in far more detail below.

Willis filed the initial *pro se* complaint in this case on September 26, 2012. (docket no. 1.). On January 24, 2013, Judge O'Brien entered an initial review order (IRO) allowing Willis's claim to proceed and appointing attorney Jay Denne to represent him. (docket no. 2). On February 15, 2013, Judge O'Brien entered an IRO in case C13-4018, consolidating Matlock's then pending pro se complaint with Mr. Willis's above captioned case. (docket no. 8).

Mr. Denne subsequently filed an amended complaint on behalf of Willis and Matlock. (docket no. 16) The amended complaint had six counts. First, the plaintiffs alleged that the defendants failed to provide proper treatment under the Fourteenth

Amendment to the U.S. Constitution, the Iowa Constitution, and the Iowa Code. Second, the plaintiffs alleged that the defendants were inflicting unconstitutional punishments under both the Fourteenth Amendment and the Iowa Constitution. Third, the plaintiffs alleged that the defendants were failing to use the least restrictive type of confinement as required by the Fourteenth Amendment and the Iowa Constitution. Fourth, the plaintiffs alleged that the defendants were subjecting CCUSO patients to inhumane treatment in violation of the Fourteenth Amendment and the Iowa Constitution. Fifth, the plaintiffs allege that I.C.A. Section 229A is unconstitutional as applied. Sixth, the plaintiffs alleged common law breach of contract relating to the CCUSO Handbook and treatment contracts. (docket no. 16).

On May 2, 2013, the defendants filed their motion to dismiss. (docket no. 17). On June 14, 2013, Judge O'Brien entered an IRO in C13-4047-DEO. (docket no. 21). In that pro se case, plaintiffs Taft, Huston, Millsap, Wright, Risdal, and Philips alleged that they were not receiving meaningful treatment and that CCUSO's program was unconstitutionally punitive in nature. Judge O'Brien concluded their *pro se* case made claims similar to those made by Willis and consolidated C13-4047-DEO with the above captioned case. (docket no. 21). Judge O'Brien also appointed attorney Robert Tiefenthaler to act as co-counsel on the case along with Mr. Denne. *Id.*

On June 21, 2013, Judge O'Brien entered an IRO in case C13-4052-DEO. In that pro se complaint, Williams asked to be added to Willis's case. Judge O'Brien granted his request. (docket no. 23). On July 26, 2013, the defendants filed a motion to sever the Taft group of plaintiffs from the rest of the case. (docket no. 21). Judge O'Brien conducted a hearing and denied that motion on August 16, 2013. (docket no. 40). On September 4, 2013, the plaintiffs filed a second amended complaint. (docket no. 41). In the second amended complaint, the plaintiffs made the same general allegations as in the

initial amended complaint, discussed above, but added plaintiffs Taft, Huston, Millsap, Wright, Risdal, Williams, and Philips. (docket no. 41).

On September 25, 2013, the defendants filed an amended motion to dismiss. (docket no. 42). On September 15, 2014, Judge O'Brien granted in part and denied part the motion to dismiss. Specifically, Judge O'Brien allowed all of the plaintiffs' claims to proceed except those filed under the Iowa Tort Claims Act. (docket no. 51, p. 24).

On September 26, 2014, the defendants' filed an answer, generally denying the plaintiffs' allegations and alleging various affirmative defenses. (docket no. 52). Shortly thereafter, two additional CCUSO patients filed *pro se* complaints similar to those filed in this case. Judge O'Brien considered those filings (docket nos. 57 and 63) as motions to join. After giving the parties an opportunity to respond, Judge O'Brien denied the motions to join and stayed the two new cases pending the resolution in this case. (docket nos. 67 and 68). The defendants filed the present motion for summary judgment on July 28, 2015. (docket no. 71). On August 18, 2015, Judge O'Brien passed away and this case was reassigned to me. On October 16, 2015, the plaintiffs filed a resistance. (docket no. 79). On October 22, 2015, the defendants filed a final reply brief. (docket no. 80).

### B.      Factual Findings

This case involves the legal history of CCUSO, the state of the treatment program at CCUSO, and the history of various CCUSO patients. Many of the facts are undisputed.

#### 1.      Civil commitment generally

Confining individuals with mental health disorders has a long, and often ugly, history in this country. Historically,

> the criminal justice system was afforded considerable
> prerogative in the performance of its duties which allowed it
> to discreetly "sweep up" [the mentally ill]. Sanctions could
> be imposed for "status offenses," such as vagrancy, even

> though a specific criminal act had not occurred. Law enforcement officials similarly had wide latitude in their investigations of crimes, with relatively few protections provided to a criminal suspect (e.g., little scrutiny was given to the circumstances under which a confession was given). Following conviction, criminal sentences varied widely and could be increased for individuals perceived as particularly threatening. Finally, once incarcerated, the focus was on assuring secure custody at minimal cost.

Thomas L. Hafemeister & John Petrila, *Treating the Mentally Disordered Offender: Society's Uncertain, Conflicted, and Changing Views*, 21 FLA. ST. U. L. REV. 729, 733 (1994). Thankfully, the civil rights era brought increased awareness to those suffering from mental illness and also caused a reexamination of civil commitment laws. Today,

> [i]nvoluntary civil commitment statutes exist in every state, and allow the state to commit a person against his or her will if there is proof of a mental disability that poses a substantial threat of serious harm to oneself or others. The threat of harm must be real and present, and the burden of proof to establish dangerousness (to self or others) must be clear and convincing.

Sarah E. Spierling, *Lock Them Up and Throw Away the Key: How Washington's Violent Sexual Predator Law Will Shape the Future Balance Between Punishment and Prevention*, 9 J.L. & POL'Y 879, 880-81 (2001). The state of Iowa commits persons suffering from 'normal' mental illness pursuant to IOWA CODE § 229.[2]

The U.S. also has a long history of committing persons considered sexual deviants.

> The involuntary commitment of sexual predators has its roots in the 1930s when state legislatures first introduced procedures for confinement of "sexual psychopaths, sexually dangerous persons, and sex offenders." The State of

---

[2] The irony of describing "normal" mental illness is not lost on me. In this context, I mean mental health committals arising out of a state court finding that a person is suffering from mental illness and is a danger to themselves or others.

Michigan was the first state to pass such legislation in 1937. These statutes varied in nature and in jurisdictional basis. Some required prior criminal convictions for sex offenses. Many laws required different evidence of mental illness, personality disorders, and propensity to sexually re-offend. Virtually all statutes provided for involuntary civil commitment until the offender was deemed no longer a danger or threat to society. Many of the states labeled these statutes as Mentally Disordered Sex Offender (MDSO) statutes. Sex offender treatment was emphasized for these offenders because it was believed that this population was likely to have high rates of recidivism and would be amenable to treatment. Further, some groups of sex offenders, such as pedophiles, were likely to be ostracized by non-sex offenders and would need segregation within a prison setting. Commitment as a MDSO usually required that the defendant be likely to commit sex offenses as a result of a "mental disease or defect." Many of the states' original MDSO statutes were construed so that commitment could be of an indefinite duration. Release from the institution could only be initiated by the superintendent of the facility and approval by the committing court. Many later statutes limited the time of confinement to be the maximum time the defendant could have been sentenced to prison if convicted criminally. More than half of the states had implemented sexual predator legislation by 1960; however, by the end of the 1980s this number had been cut in half due to concerns regarding the violation of constitutional rights and the questionable efficacy and success of sex offender treatment.

John M. Fabian, *Kansas v. Hendricks, Crane and Beyond: "Mental Abnormality," and "Sexual Dangerousness": Volitional vs. Emotional Abnormality and the Debate Between Community Safety and Civil Liberties*, 29 WM. MITCHELL L. REV. 1367, 1372-73

(2003).[3]  The decline in sex offender commitment was short lived.  "Because of the increase in commitment of sexual predators and high publicity sex offending cases, the 1990s witnessed a resurgence of legislative activity.  Many states implemented statutes authorizing civil commitment of sexually violent sex offenders."  Id.  Kansas was one of the first states to institute this new type of civil commitment for sex offenders.  Under the Kansas law, sex offenders who had previously been criminally convicted of sex crimes could be civilly confined for indefinite treatment if they were found to pose an ongoing risk to society because of a mental abnormality.  KAN. STAT. ANN. § 59-29a01.  The Kansas Supreme Court struck down the statute, holding that commitment based on a mental "abnormality" did not satisfy the substantive due process requirement that involuntary civil commitment must be based on a finding of mental illness.  *In re Hendricks*, 912 P.2d 129, 138 (1996).  Kansas appealed to the Supreme Court.  Justice Clarence Thomas, writing for the 5-4 majority, reversed, stating:

> [T]he Kansas Sexually Violent Predator Act comports with due process requirements and neither runs afoul of double jeopardy principles nor constitutes an exercise in impermissible ex post facto lawmaking. Accordingly, the judgment of the Kansas Supreme Court is reversed.

*Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 2086, 138 L. Ed. 2d 501 (1997).  However, Justice Kennedy qualified that holding in his concurrence:

> If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function... We should bear in mind that while incapacitation is a goal

---

[3] These early sex offender laws were often used as a tool to confine and "'treat'" homosexuals.  "[W]hite professional or skilled-worker men convicted of minor sexual offenses, homosexuality, or sexual relations with children, were more likely to be '"treated'" under the sex offender laws."  Deborah W. Denno, *Life Before the Modern Sex Offender Statutes*, 92 NW. U. L. REV. 1317, 1374 (1998).

> common to both the criminal and civil systems of
> confinement, retribution and general deterrence are reserved
> for the criminal system alone.     On the record before us,
> the Kansas civil statute conforms to our precedents.     *If,
> however, civil confinement were to become a mechanism for
> retribution or general deterrence, or if it were shown that
> mental abnormality is too imprecise a category to offer a solid
> basis for concluding that civil detention is justified, our
> precedents would not suffice to validate it.*

*Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring in judgment) (emphasis added).

After Kansas's statutory scheme survived the Supreme Court challenge, the Iowa Legislature enacted IOWA CODE CH. 229A, which is very similar to Kansas's law.  As explained by the Iowa Legislature:

> The general assembly finds that a small but extremely
> dangerous group of sexually violent predators exists which is
> made up of persons who do not have a mental disease or defect
> that renders them appropriate for involuntary treatment
> pursuant to the treatment provisions for mentally ill persons
> under chapter 229, since that chapter is intended to provide
> short-term treatment to persons with serious mental disorders
> and then return them to the community.  In contrast to persons
> appropriate for civil commitment under chapter 229, sexually
> violent predators generally have antisocial personality
> features that are unamenable to existing mental illness
> treatment modalities and that render them likely to engage in
> sexually violent behavior.  The general assembly finds that
> sexually violent predators' likelihood of engaging in repeat
> acts of predatory sexual violence is high and that the existing
> involuntary commitment procedure under chapter 229 is
> inadequate to address the risk these sexually violent predators
> pose to society.  The general assembly further finds that the
> prognosis for rehabilitating sexually violent predators in a
> prison setting is poor, because the treatment needs of this
> population are very long-term, and the treatment modalities
> for this population are very different from the traditional
> treatment modalities available in a prison setting or for

persons appropriate for commitment under chapter 229. Therefore, the general assembly finds that a civil commitment procedure for the long-term care and treatment of the sexually violent predator is necessary. The procedures regarding sexually violent predators should reflect legitimate public safety concerns, while providing treatment services designed to benefit sexually violent predators who are civilly committed. The procedures should also reflect the need to protect the public, to respect the needs of the victims of sexually violent offenses, and to encourage full, meaningful participation of sexually violent predators in treatment programs.

IOWA CODE § 229A.1. Following enactment of IOWA CODE § 229A, the state began filing petitions to commit criminals convicted of sex crimes to the mental hospital in Cherokee, Iowa.

### 2. *The treatment process*

Once patients are committed to CCUSO, they begin to travel through the "Phases" of treatment, which are described in the CCUSO Patient Handbook and Orientation Manual (the Handbook). As previously set out by the Iowa Supreme Court:

Each phase adheres to a general time line of progression from one phase to the next. The first phase is the assessment and observation phase. The handbook describes this phase as the time patients and program staff have an opportunity to become acquainted and to develop a clear understanding about program expectations and rules. A patient is able to move to phase two once the patient has demonstrated a stable and cooperative behavioral pattern and completes each of the following requirements: (1) completion of all psychological testing; (2) admission of some sexual offense or completion of a clean polygraph; (3) completion of relaxation training and basic cognitive skills training; (4) orientation to the program and completion of the patient handbook; (5) thirty days of good behavior free from any major infractions; and (6) signing a phase two contract with request for placement in phase two.

In the second phase, the patient enters the core phase. The patient participates in a minimum one-year curriculum of psycho-educational groups. These groups are designed to teach concepts and skills that are fundamental to learning to control sexual impulses. In order to advance to level three, the patient must pass an oral or written exam over the curriculum and complete the following requirements: (1) satisfactory completion of four quarters of psycho-educational classes; (2) pass polygraph exams concerning minor victims, adult victims, and paraphilias; (3) freedom from major behavioral reports and close supervision for ninety days; (4) no ratings lower than three on the last ninety-day review; and (5) signing a phase three contract and submitting a written request for placement in phase three.

In the third phase, the patient enters the advanced phase. In this phase, the patient will work on applying the principles and concepts learned in phase two and achieving the goals established in an individualized treatment plan. Basic requirements for advancement are: (1) no ratings lower than five on the last ninety-day review; (2) absence of any major behavioral reports for the last four months; (3) completion of specific offense polygraphs, if requested; (4) development of an individualized treatment plan; (5) completion of victim sheets and victim letters; and (6) signing a phase four contract and submitting a written request for placement in phase four.

*Swanson v. Civil Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 303-04 (Iowa 2007).[4]  Phase IV is called the demonstration phase, the final phase before transitional release.  Requirements for completion of Phase IV include the following:

> 1)  detailed relapse prevention plan completed and approved by clinical team; 2) successful completion of polygraph exam

---

[4] The 2014 version of the Handbook cited in the parties' filings has some variations.  For example, in Phase I, the Handbook no longer requires a separate "'orientation period."'  Phase II increased the time period for being free from reports to six months, but stipulated that physically aggressive reports were the only ones that counted.

regarding recent sexual fantasies and behaviors, with no new admissions and just prior to completion of annual review; 3) 180 days of good behavior, free from major behavioral reports and close supervision; 4) no ratings less than 8 on the last 90-day review; 5) demonstration of good sexual control and non-deviant sexual responses through the PPG and the Abel Screen, and absence of problematic sexual behavior, including deviant masturbatory fantasies; 6) demonstration of financial responsibility; 7) begin making reparations to victims by giving time or money to groups that serve victims. For example, making things for victim's organization or making donations. All donations will be anonymous; 8) signing a Phase V application requesting placement in Phase V, with completion of all treatment goals in your individual treatment plan will result in therapist notifying the evaluator of the completion of Phase IV for requirements. The evaluator will independently review in order to determine if all transitional release criteria has been met; and 9) placement in a Transitional Phase by the committing court.

(docket no. 72-1, p. 49-50). In transitional release, Phase V, the requirements become expansive.

1) Maintain housing in CCUSO apartment for a minimum of one year without violating any rules or deviating from the relapse prevention plan. 2) Successful completion and passing all polygraph exams without any new admissions or reports of sexually inappropriate or risky behavior. 3) One year of good behavior free from any behavioral reports or behavior qualifying for a report. 4) Consistent acceptable ratings on the Sex Offender Intervention and Progress Scale (SOTIPS). 5) Successfully maintain employment (or participation in a volunteer program if retired or unable to work), for at least one year. 6) Demonstrate an adequate financial and social support system and the ability to make responsible financial decisions. 7) Attend support/therapy groups along with individual therapy/counseling as determined by the Treatment Team. 8) Fulfill all requirements included in the patient's court ordered

> transitional release plan for a minimum of one year.   9)
> Submit to and pass all random physiological assessments
> requested by the Treatment Team.  10) Refer to the Transition
> Handbook for additional expectations and information.

(docket no. 72-1, p. 51).  A patient should be discharged after completing transitional release into a period of release with supervision.  Release with supervision is very similar to criminal probation.  Transitional release and release with supervision are both specifically authorized by statute.  *See* IOWA CODE §§ 229A.8A and 229A.9A. [5]

CCUSO had eighty patients January 1, 2010.  Thirteen more were admitted in 2011, thirteen in 2012, four in 2013, five in 2014, and six in the first half of 2015.  On December 31, 2010, nine CCUSO patients were in transitional release and none in release with supervision.  On December 31, 2011, twelve were in transitional release and none in release with supervision.  On December 31, 2012, after Judge O'Brien originally allowed this case to proceed, thirteen were in transitional release and two were in release with supervision.  On December 31, 2013, eighteen were in transitional release and three were in release with supervision.  On December 21, 2014, after Judge O'Brien denied the defendants' motion to dismiss, fourteen patients were in transitional release and seven were in release with supervision.

Between 1998 and 2010, no patients successfully completed CCUSO's treatment program.  Some patients were discharged, but for technical reasons.  Since 2010, eleven patients and one plaintiff (Matlock) have been discharged from the CCUSO program by the Iowa state court.  Those patients include the following:

---

[5] CCUSO also uses a complicated level system to reward and discipline patients. Patients move upwards through the levels for good behavior, and downward through the levels for bad behavior.  The higher a level the patient is on, the more privileges they receive.  Privileges tend to relate to food, access to certain amenities, or recreational opportunities.

a. Mr. Elet was discharged following DHS authorizing a Petition for Discharge. b. Mr. Lehman, Mr. Fowler, Mr. Stenzel, and Mr. Geltz, were discharged due to technical legal issues. c. Mr. Cubbage was discharged following a notice of no objection from the State. d. Mr. Hollins, Mr. Hoffert, Mr. Johnson, and Mr. Matlock were discharged following a court finding that they no longer suffered from a mental abnormality. Mr. Hoffert and Mr. Matlock successfully completed release with supervision.

(docket no. 72, p. 2). Mark Etie was also discharged after completing release with supervision.[6] (docket no. 75). Since 2010, four patients passed away due to natural causes: two died from cancer, one from complications of Hepatitis C, and one from a fatal heart attack. Based on those facts, it is clear six patients—Cubbage, Etie, Hollins, Hoffert, Johnson, and Matlock—were discharged for reasons related to successful treatment. Put another way, patients were slightly more likely to be successfully treated and released than they were to die in custody. Only two patients were released because of successful treatment before Judge O'Brien allowed this case to proceed.

The nine plaintiffs in this case were all committed to CCUSO at the time this action was commenced. Plaintiffs Damon Willis, Calvin Matlock, and Harold Williams were in the Transitional Release Program at CCUSO. Plaintiffs Taft, Huston, Risdal, Wright, Phillips, and Millsap were in Phase II of the program when they joined the case. (docket no. 42-1, p. 2). Some of these designations have since changed.

### 3.    *Defendants*

The defendants in this cast are the following: 1) Charles Palmer, the head of the Iowa Department of Human Services, the agency that oversees CCUSO; 2) Dr. Jason Smith, the former administrator of CCUSO; and 3) numerous individual treatment

---

[6] It is worth noting that this discharge occurred both after Judge O'Brien allowed this case to proceed and after Etie volunteered to be castrated. (docket no. 75-1).

providers (therapists and social workers) from CCUSO. CCUSO has experienced considerable staff turnover since this case was initiated. Of the named therapist defendants, only Steve Tjaden and William Turner remain as full time CCUSO employees. Dr. Jason Smith is still with the program as a consultant, but is no longer the program administrator.

*Steve Tjaden* is employed by CCUSO, has a master's degree in social work (with a corresponding license in the State of Iowa), and is a sex offender treatment professional (certified by the Iowa Board for the Treatment of Sex Offenders). He began working at CCUSO in 2008, where he originally was a "psychiatry security specialist", responsible for supervising patients, including writing progress notes and writing incident reports. In 2010, Tjaden became a psychology assistant, responsible for handling a treatment caseload which included seeing patients in both an individual and group setting.

*Robert Stout* was hired as CCUSO's chaplain in 2003. Stout has no professional education related to the treatment of sex offenders. He is a Baptist minister by profession, and left CCUSO in 2014.

*Matthew Royster* was a therapist with CCUSO for twelve years, who was "forced" to resign in approximately 2013.

*William (Bill) Turner* testified that he is an inactive licensed mental health counselor and an inactive licensed social worker, both in the state of Iowa. His only active license in the State of Iowa is as a certified rehabilitation counselor. He started with CCUSO in 2003 and remains employed there.

*Dr. Michael Loescher* is a psychologist who worked at CCUSO for eighteen months starting in 2013.

*Dr. Jason Smith* is a psychologist who was the administrator at CCUSO from 2003-2014. He also ran the other state mental health facilities at Cherokee for a portion of that time. He left CCUSO in 2014, but returned as a consultant in 2015.

***Charles Palmer*** is the head of the Iowa Department of Human Services and has been in that position since 2011.

### 4. *Defendants' deposition testimony*

One of the plaintiffs' primary claims is that CCUSO does not provide adequate treatment. Dr. Smith testified that, nationally, civilly committed patients receive between two and seventeen house of therapy a week, and that there really is no national consensus on how much treatment is needed or what treatment is best. Dr. Smith testified that, at the time he left, CCUSO was providing somewhere between 4 and 6 hours of treatment per week and that he tried to maintain a caseload of 12-15 patients per therapist. However, as set out in the plaintiffs' reply to the defendants' statement of facts:

> During his deposition, Dr. Jason Smith was asked whether therapists at CCUSO had ever communicated that they needed more therapists to be able to do their job effectively, and he responded: "Yes, therapists would comment about the caseloads increasing and needing – more support." (Defendants' App. pp. 96, 97). Furthermore, Dr. Smith was asked if CCUSO had been looking for additional therapists for over a year and Dr. Smith responded "Yeah, and – and looking and also trying to obtain approval to hire additional therapists." (Defendants' App. p. 105). He was then asked if it would be fair to state that the patients of CCUSO had not been receiving adequate treatment since they had not had enough therapists to provide treatment over the past year, and he answered "Yeah."

(docket no. 79-4, p. 2). He also testified that most of the sex offender treatment was conducted in group sessions, as opposed to one on one meetings. The parties dispute the value of individual therapy. Tjaden testified that, when he started at CCUSO, there were approximately seven full time therapists, and he had a case load of 12-15 patients. He testified that, because of an increase in patients and a decrease in staff, he now has as many as 18 patients. He stated:

> "I don't have time to do individual sessions at all now so
> everything is based on groups. We don't – we have such few
> therapists that we can't offer all the psychoeducation groups
> that are required, that I feel are needed." Mr. Tjaden was also
> asked how the individual sessions are helpful as opposed to
> the group sessions, and he responded "Well, some people
> don't participate very well in group. So if they're sitting in
> group and they're not really giving much input, I don't really
> know where they are. But if I'm sitting down with them one
> on one, I have a better sense of what they need, and then I
> can direct them to some activities that will help them grow."

(docket no. 79-2, p. 4). Tjaden was unequivocal that patients do not get enough group
therapy sessions. He said that CCUSO did not comply with the Handbook, which says
treatment should be "intensive." Tjaden testified he thought staff left CCUSO because
the pay was too low. Most importantly, Tjaden testified that if there were more staff
members at CCUSO, more patients would have progressed through treatment and been
released.

Similarly, Pastor Stout testified:

> [B]ecause he had some background in psychology, he was
> asked to lead some psychiatric courses for patients. As the
> number of therapists decreased and the number of patients
> increased, he was given more responsibility to not only do
> psychiatric education classes, but also to do therapy for
> patients.

(docket no. 79-2, p. 5). Ultimately, Stout testified that he spent eighty percent of his
time doing therapy, and only twenty percent providing religious vocation. He also
testified that, over his eleven years at CCUSO, weekly treatment hours provided to
patients decreased from ten to four.

Royster, another therapist, testified more equivocally, at times indicating that
CCUSO provided "enough" treatment, while also saying that treatment was delayed and
"not" intensive because CCUSO was short-staffed. Royster did testify that his caseload

increased from less than ten patients when he started to nearly thirty when he left CCUSO. Royster stated that CCUSO needed more therapists to adequately treat all the patients. Similarly, Turner testified that his caseload increased from nine patients to thirty-two patients and that he is "spread so thin." (docket no. 79-2, p. 8). He stated that the size of his caseload makes it difficult to provide services to patients. As the number of patients has increased, and the number of staff has decreased, the length of time between patient evaluations has increased by nearly two months.

Dr. Loescher complained about the amount of documentation required to treat CCUSO patients. He said he left, in part, because it was difficult to provide services in an institution like CCUSO.

Palmer testified that, as the head of the Department of Human Services (DHS), he oversees both the budget for CCUSO and has ultimate control of the facility. He testified that he believed CCUSO was adequately staffed, and that the treatment program ran well. He stated he had never visited CCUSO.

### 5. *Plaintiffs*

*Damon Willis* has two sexual offense convictions. In 1986, he and another male asked girls for directions and offered them a ride. When one of the girls tried to run, he chased her, forced her to perform oral sex on him, and raped her. His second offense is for sexual assault on an inmate while incarcerated. Willis reported he sexually victimized six individuals in prison. He has been at CCUSO for well over ten years.

Willis has been in transitional release on multiple occasions. In 2007 he was in transitional release (TRP), which was revoked after he had sex with a visitor at the facility. He was returned to secure custody. In June 2011, he moved to TRP, then was returned to secure confinement after obtaining and viewing pornography. He returned to TRP for a third time in June 2012. In October 2013, a motion was filed to revoke him

for having sex with a woman in public and lying about it. The state court confirmed the violation but kept him in TRP. Since then, Willis has remained in transitional release.

*Calvin Matlock* has three convictions for sex abuse dating back to the early 1980s. *In re Det. of Matlock*, 860 N.W.2d 898, 900 (Iowa 2015). Specifically,

> [h]is last conviction was in 1995, and prior to his set release from prison in 2000, the State filed a petition to place Matlock in civil commitment for sexually violent predators. In July 2001, a civil jury found Matlock was a sexually violent predator as defined by Iowa Code section 229A.2(9) (2001). Following the verdict, the district court confined Matlock to the Civil Commitment Unit for Sexual Offenders (CCUSO).

*In re Det. of Matlock*, 860 N.W.2d at 900. Matlock began release with supervision in 2014 and was discharged from the program on June 26, 2015. Matlock won a case at the Iowa Supreme Court shortly before he was discharged. The Iowa Supreme Court remanded his case, "back to the district court to review the release-with-supervision plan to ensure it is not punitive in nature." *Id*. at 908.

*Harold Williams* has been at CCUSO since 2000.

> The State [sought to civilly commit] Williams [before he was discharged from] a sentence for second-degree sexual abuse, having served ten years on an indeterminate twenty-five year term. See Iowa Code §§ 709.3(2), 902.9(1) (1987) (defining crime of second-degree sexual abuse and punishment therefor). The victim of Williams' sexual assault was the five-year-old daughter of friends with whom he was then living. This incident, which involved digital penetration, followed four other convictions for sexual misconduct with children. In 1977, Williams pled guilty to lascivious acts with a child. Iowa Code § 725.10 (1977). He was released after serving roughly one-half of his five-year sentence. In 1981 he pled guilty and served a short prison term for indecent contact with a child. 1981 Iowa Acts ch. 204, § 7 (codified at Iowa Code § 709.12(1) (1983)). Again, in 1984, Williams pled guilty and served time for two more charges of indecent

> contact and lascivious acts. Iowa Code §§ 709.12(1),
> 709.8(1) (1983).

*In re Det. of Williams*, 628 N.W.2d 447, 455 (Iowa 2001). Williams made it to TRP on at least two occasions, but was returned to secure confinement after searching for porn and pictures of nude children on one occasion and looking for children in Wal-Mart on another occasion. He remains in secure confinement.

**David Taft, Jr.** has appeared frequently before this court. *See Taft v. Palmer*, 2015 WL 859489 (N.D. Iowa 2015), setting out his complete case history. Taft was committed to CCUSO in 2005. As the Iowa Supreme Court explained,

> Taft was arrested in December 1987 for lascivious acts with a minor, based on allegations that he sexually molested his sister and committed other criminal sexual offenses. He was convicted and sentenced to two five-year terms and a two-year term to run concurrently. He served this sentence and was discharged on May 31, 1991. Seven days after his discharge from prison, Taft reoffended by sexually assaulting two girls who were unknown to him—one who was eight years old and the other who was ten. He was arrested and charged with second-degree sexual abuse, assault causing injury, and burglary. He was convicted and sentenced to prison. Taft was discharged from prison for these offenses on January 10, 2005.

*Taft v. Iowa Dist. Court ex rel. Linn Cty.*, 828 N.W.2d 309, 311 (Iowa 2013). Taft has never progressed out of Phase II of the treatment program.

**Paul Blaise a.k.a. Paul Huston**, whose 28 U.S.C. § 2254 petition I recently denied, *see Huston v. Smith*, 2016 WL 146493 (N.D. Iowa 2016), has

> a long history of sexually aberrant behavior, going back as early as 1989. He was convicted of sexual abuse in the third degree in 1991 after abusing a nine-year-old girl and was sentenced to a ten-year term of imprisonment. After his release, he was in and out of jail and prison for a variety of offenses, including sexually related offenses. Even while

incarcerated, Blaise was unable to contain his sexual deviance and sexual assault threats, and as a result, he received numerous disciplinary reports for sexual misconduct.

*Blaise v. State*, 801 N.W.2d 627 (Iowa Ct. App. 2011). The state initiated proceedings to commit Blaise in 2007, after a different conviction:

> As S.E. walked through River View Park in Fort Madison[, Iowa] in October 2005, Paul Blaise, who was collecting cans in the park, approached her and began asking her questions. He asked her if she was married, if she was sexually active, and if she would engage in anal sex. He wondered if she had ever been the victim of a violent crime, if she would use lubrication to have anal sex, if she would take her clothes off or have sex if someone asked her or threatened to hurt her. Although S.E. grew increasingly uncomfortable and quickened her pace, Blaise kept up with her while continuing to ask "hypothetical" questions. S.E. tried repeatedly to change the conversation and eventually ran away from Blaise and asked another pedestrian to walk her to her car. After warning another female pedestrian that "there was someone in the park talking about rape and guns and all kinds of sexual stuff," S.E. called the police. Officers located Blaise in the park and discovered he was carrying a gun. Blaise ultimately pled guilty to first-degree harassment and received a two-year sentence.

*In re Det. of Blaise*, 830 N.W.2d 310, 313 (Iowa 2013).[7] He has not progressed beyond Phase II of the treatment program.

**Syveno Wright** was civilly committed in 2006. His criminal conviction arose when:

> the State charged [him] with kidnapping in connection with sexual abuse of an eleven-year-old West Des Moines child.

---

[7] Blaise's case took several rounds of appeals before his commitment was finalized in 2013. However, he was in custody for the duration of those appeals.

> Wright pled guilty to second-degree sexual abuse, in violation
> of Iowa Code sections 709.1 and 709.2 (1993).

*Wright v. State*, 2000 WL 564037, at *1 (Iowa Ct. App. 2000). Wright has not progressed beyond Phase II of the treatment program.

**Eddie Risdal** was

> tried and convicted of second-degree and third-degree sexual
> abuse of two minor boys. See Iowa Code §§ 709.1(3),
> 709.3(2), 709.4(5) (1985). He was sentenced to serve two
> consecutive indeterminate terms of incarceration-one term not
> to exceed twenty-five years, the other not to exceed ten years.

*State v. Risdal*, 404 N.W.2d 130, 130 (Iowa 1987). A jury determined that he was a sexually violent predator in 2004. *In re Det. of Risdal*, 723 N.W.2d 449 (Iowa Ct. App. 2006). Risdal has never progressed beyond Phase II of the treatment program.

**Donald Phillips** was convicted of multiple counts of indecent exposure, enticing a child, and sexual abuse. He is currently in Phase IV of the treatment program.

**Michael Millsap** has a

> long history of sexually abusing minor children. In 1979
> Millsap sexually abused a paperboy and was adjudicated a
> delinquent for that offense. In 1981 Millsap entered an
> elementary school and sexually abused a young boy in the
> bathroom. He pled guilty to third-degree sexual abuse for
> that offense. While on parole following that conviction,
> Millsap attempted to sexually abuse another boy, which led to
> the revocation of his parole. In 1988 Millsap pled guilty to
> the crime of indecent contact with a child in connection with
> abuse he perpetrated on his four-year-old cousin. In 1992
> Millsap pled guilty to the crime of second-degree sexual abuse
> for pulling a fifteen-year-old boy into a bathroom at a church
> and sexually abusing him. Prior to Millsap's release from
> prison for the 1992 conviction, the State filed a petition to
> have Millsap civilly committed as a sexually violent predator
> pursuant to Iowa Code chapter 229A. A jury trial commenced
> on September 19, 2005.

*In re Det. of Millsap*, 723 N.W.2d 453 (Iowa Ct. App. 2006). Millsap has never progressed beyond Phase II of the treatment program.

### 6.    *Relief*

In their statement of facts, the defendants spend considerable time discussing deposition testimony from the various plaintiffs. Specifically, the defendants assert that almost all plaintiffs testified that they either believed or hoped that the resolution of this case would result in them being released from CCUSO. The defendants believe that this testimony is relevant to the *Heck v. Humphrey* legal argument discussed below. However, in their amended complaint, the plaintiffs ask that:

> a. the unlawful conduct alleged herein be declared to be illegal and in violation of the federal, state and common law claims alleged herein; b. That the Court order Defendants to provide proper treatment, appropriate less restrictive alternatives, and in general operate CCUSO without an improper purpose of punishment; c. That Defendants be enjoined from engaging in the same or similar practices alleged herein; d. That Plaintiffs recover actual damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs; e. That Plaintiffs receive pre-judgment and post-judgment interest as allowed by law; f. That Plaintiff [sic] recover their costs of the suit, and attorneys' fees as allowed by law; and g. All other relief allowed by law and equity.

(docket no. 41, p. 14).

## II.    LEGAL ANALYSIS

### A.    Issues

Defendants make seven arguments. First, they argue that I should exercise my discretion and abstain from this case. Second, defendants argue that the plaintiffs' claims are Heck barred because a favorable ruling would invalidate their state court commitments. Third, defendants broadly argue that the conditions of treatment at

CCUSO do not violate any constitutional standards. Fourth, defendants argue that they are entitled to qualified immunity. Fifth, they argue that certain individual defendants are not personally responsible. Sixth, the defendants argue that plaintiffs' contract claims are not properly before the federal court. Finally, the defendants argue that they are immune from money damages.

### B.      Summary Judgment Standard

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. FED. R. CIV. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). The movant must also demonstrate that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at

323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see also Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87). Put another way, once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))); FED. R. CIV. P. 56(c) (explaining that the non-movant must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials" to show that a fact "is genuinely disputed").

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, [557 U.S. 557], 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).... "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042–43. Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## C. Younger *Abstention*

### 1. Standard

*Younger v. Harris*, 401 U.S. 37 (1971), instructs federal courts to abstain when certain types of "exceptional" parallel state court proceedings exist. *Sprint Comm., Inc. v. Jacobs*, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013). Federal court abstention is warranted when one of a few "exceptional" types of parallel pending state court proceedings exist: "state criminal proceedings, civil enforcement proceedings, and civil

proceedings involving certain orders that are uniquely in furtherance of the state court's ability to perform their judicial function." *Id.* at 588 (quotations omitted). "Abstention is appropriate in such circumstances because the prospect of undue interference with state proceedings counsels against federal relief." *Banks v. Slay*, 789 F.3d 919, 923 (8th Cir. 2015) (internal citations omitted). The Eighth Circuit Court of Appeals has stated that:

> [t]here are essentially three issues that must be addressed in determining whether to invoke the *Younger* abstention doctrine: (1) whether the action complained of constitutes an ongoing state judicial proceeding; (2) whether the proceedings implicate important state interests; and (3) whether there is an adequate opportunity in the state proceedings to raise constitutional challenges.

*Night Clubs, Inc. v. City of Fort Smith, Ark.*, 163 F.3d 475, 479 (8th Cir. 1998).

## 2. *Analysis*

The defendants' first argument is that I should abstain from this case because each plaintiff is entitled to have their civil commitment reviewed by the Iowa state court on a yearly basis.

Judge O'Brien previously considered the abstention argument in his motion to dismiss ruling. In denying the argument at that time, he pointed to a similar argument raised in *Ireland v. Anderson*, 2014 WL 3732014 (D. N.D. 2014). *Ireland* is a similar case against North Dakota's civil commitment program that North Dakota federal court allowed to proceed. In that case, the civilly committed plaintiffs alleged that the North Dakota's sexual offender program "denied plaintiffs and class members the right to be free from punishment, denied plaintiffs and class members the right to be free from punishment without a jury trial..." The North Dakota court denied the states' motion to dismiss on abstention ground. Judge O'Brien ruled that Magistrate Judge Klein's conclusion in that case applied to this case as well:

> [I]f the court were to accept defendants' position, the plaintiffs' proceedings would always be ongoing as long as they were civilly committed… It is unclear whether any of the plaintiffs have an annual review hearing scheduled and pending before the state district courts. Assuming there is a pending proceeding, it appears some state district courts may allow claims related to the least restrictive treatment, while others will not. It does not appear the plaintiffs would be allowed to raise other claims related to the conditions of their confinement at a review hearing, and it is unlikely they would be allowed to raise issues regarding the policies and practices utilized by the defendants in the enforcement of the statutes, other than claims related to the least restrictive treatment, and even then it would depend on whether the state district court judge decides to exercise limited review of the decision of the executive director. In light of all of the circumstances, abstention is not warranted because there is no consistent, predictable and adequate opportunity for the plaintiffs to raise their claims regarding their conditions of confinement and regarding the policies and practices utilized by the defendants in the enforcement of the statutes in proceedings before the state courts.

*Ireland*, 2014 WL 3732014 at 8-9. Judge O'Brien went on to say that, "because there are not ongoing state processes where the Plaintiffs can raise their federal claims, the Defendants' Motion to Dismiss on abstention grounds must be denied." (docket no. 51, p. 23).

The plaintiffs argue, and I agree, that the defendants have failed to articulate any change in circumstance upon which I should reconsider Judge O'Brien's ruling. It is true that each individual plaintiff has an annual review before the Iowa state court. But those annual reviews are confined to each individual's case, and whether that individual has a sexual abnormality such that commitment is appropriate. In this case, the plaintiffs allege that the defendants fail to provide proper treatment under the Fourteenth Amendment, the defendants are inflicting unconstitutional punishments under the Fourteenth

Amendment, defendants are failing to use the least restrictive type of confinement as required by the Fourteenth Amendment, defendants are subjecting CCUSO patients to inhumane treatment in violation of the Fourteenth Amendment and the Iowa Constitution, and that IOWA CODE § 229A is unconstitutional as applied. There is no allegation that there is state court process whereby these plaintiffs can raise those federal constitutional claims.

Thus, applying the three factors, it is clear that the action complained of does not duplicate an ongoing state judicial proceeding. While it is true the plaintiffs have state court cases, those cases are not about these issues. Second, there is no doubt this case involves an important state interest. As defendants properly point out:

> Iowa's interest in the administration of the civil commitment of sexually violent predator program is significant. Iowa's legislature set out the importance of the statute in its legislative findings, Iowa Code § 229A.1. The findings underscore the dangerousness of a group of sexually violent predators, and notes that procedures should reflect public safety concerns, while providing treatment services designed to benefit sexually violent predators who are civilly committed. Iowa Code § 229A.1. Iowa's significant state interests are also reflected in the procedures set out in Chapter 229A as a whole.

(docket no. 71, p. 8). The importance of treating sexual offenders notwithstanding, the question of wheth.er the state is violating a detainees' federal constitutional rights is a claim properly brought in federal court. Finally, although the defendants have made the blanket allegation that the annual reviews give plaintiffs the chance to argue these issues, the defendants have failed to allege any facts to support that assertion. Conversely, the record is full of annual reviews decisions that turn, not on constitutional questions such as whether CCUSO has become punitive in nature, but on the individual treatment notes

of the plaintiffs.[8]    Accordingly, I will not disturb Judge O'Brien's prior ruling on this issue.

### D.    Colorado River *Abstention*

#### 1.    *Standard*

The *Colorado River* doctrine:

> permits federal courts to decline to exercise jurisdiction over cases where "parallel" state court litigation is pending, meaning that there is "a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir.2013), quoting *Fru–Con*, 574 F.3d at 535.  This rule is based on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."  [*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976)] (internal quotation marks and alterations omitted).   Nevertheless, federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them," *id.*, which "does not evaporate simply because there is a pending state court action involving the same subject matter." *Federated Rural Elec. Ins. Corp. v. Ark. Elec. Coops., Inc.*, 48 F.3d 294, 297 (8th Cir. 1995).  Rather, Colorado River abstention is appropriate only in "exceptional circumstances" where the surrender of federal jurisdiction is supported by "the clearest of justifications." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25–26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).  We examine six factors to determine whether exceptional circumstances exist warranting abstention: (1) whether there is a res over which one court has established jurisdiction, (2) the inconvenience of the federal forum, (3) whether maintaining separate actions may result in piecemeal

---

[8] For example, *see* Williams's annual review report and transitional release revocation. (docket no. 72-2, p. 182-210).

litigation, unless the relevant law would require piecemeal litigation and the federal court issue is easily severed, (4) which case has priority—not necessarily which case was filed first but a greater emphasis on the relative progress made in the cases, (5) whether state or federal law controls, especially favoring the exercise of jurisdiction where federal law controls, and (6) the adequacy of the state forum to protect the federal plaintiff's rights. *Federated Rural*, 48 F.3d at 297.

*Spectra Commc'ns Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015).

### 2.    Analysis

Again, the defendants argue abstention is appropriate, under the slightly different *Colorado River* standard. As noted above, Judge O'Brien already rejected the abstention doctrine. Judge O'Brien was correct, for a number of reasons.

First, the defendants premise their argument on the claim that "plaintiffs seek release . . . Those decisions are controlled by the state . . . court." (docket no. 71-1, p. 10). While it is true that plaintiffs testified they would like to be released, the second amended complaint, which controls the relief issue, asked that I find that CCUSO's program is constitutionally deficient and order appropriate injunctive relief to correct the deficiencies. The plaintiffs' second amended complaint does not request the release of individual plaintiffs, so this action does not duplicate the state court process or infringe on issues of state law.

Second, the defendants' primary argument is under the third factor, separate trials will result in piecemeal litigation.[9] It is true that various CCUSO patients have filed state court cases in which they have made constitutional arguments. However, that does not

---

[9] The defendants concede that most of the six factors have no relevance to the present inquiry. There is no *res* at issue, neither forum is more or less convenient, federal law controls, and there is no case with particular priority.

divest the federal court from having authority over a 42 U.S.C. § 1983 case claiming a constitutional violation by a state actor. As the Supreme Court recently stated while considering a New York law trying to reserve certain violations to the state court:

> The State's policy, whatever its merits, is contrary to Congress' judgment that all persons who violate federal rights while acting under color of state law shall be held liable for damages. As we have unanimously recognized, "[a] State may not … relieve congestion in its courts by declaring a whole category of federal claims to be frivolous. Until it has been proved that the claim has no merit, that judgment is not up to the States to make."

*Haywood v. Drown*, 556 U.S. 729, 736-37, 129 S. Ct. 2108, 2115, 173 L. Ed. 2d 920 (2009) (internal citations omitted). Perhaps more importantly, these types of cases are routinely brought in federal court. For example, *Strutton v. Meade*, 668 F.3d 549, 551 (8th Cir. 2012), a case repeatedly cited by the defendants, deals with a broad constitutional challenge to the adequacy of treatment for a civilly committed sex offender in Missouri. Similarly, the *Ireland v. Anderson* case, cited above, dealt with a broad constitutional challenge to North Dakota's sexual offender program, and *Karsjens v. Jesson*, which will be discussed below, concerned a broad challenge to Minnesota's sexual offender treatment program. Absent the defendants pointing to a specific state court case concerning the specific issues raised by the plaintiffs in this case, *Colorado River* abstention is not appropriate because there is no danger of "piecemeal" findings by different courts.[10]

---

[10] The one case cited by the plaintiffs is *In re: the Detention of Matlock*, 860 N.W.2d at 898. That case dealt with due process concerns in the context of a state court modifying the conditions of a CCUSO patient's' release with supervision – which is not an issue in this case. And, the Iowa Supreme Court did not issue a definitive ruling, saying, "We do have a concern about the constitutionality of the release conditions the

### E.  Heck v. Humprey

#### 1.  The standard

The Defendants next argue that this type of suit is barred by the ruling in *Heck v. Humphrey*, 512 U.S. 477 (1994).  In *Heck v. Humphrey*, the Supreme Court held that:

> when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 487.  Even when a plaintiff demands only money damages, he cannot bring a non-habeas civil action that would call into question the lawfulness of his detention. *Sheldon v. Hundley*, 83 F.3d 231, 233 (8th Cir. 1996).  Several courts have extended the Heck doctrine to civil commitments, including the civil commitments of sexually violent predators.  *See Huftile v. Miccio–Fonseca*, 410 F.3d 1136, 1139–40 (9th Cir. 2005) (holding that *Heck* applies to civilly committed detainees who are confined under California's "Sexually Violent Predators Act"), *cert. denied*, 547 U.S. 1166 (2006).

#### 2.  Analysis

The defendants argue,

> This court recently adopted the position that an SVP seeking release in federal court was *Heck* barred.  *Curtiss v. Palmer*, No. 12-cv-4035, 2015 WL 728466 (N.D. Iowa Feb. 19, 2015) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994).  A

---

district court imposed on Matlock because the record is insufficient for us to determine if the State has proven the plan comports with Matlock's due process rights. . . [W]e remand the case back to the district court to determine if the State proved the terms of supervision are consistent with the principles of due process under the Iowa and the United States Constitutions." *Id.*, at 909.  As I noted above, the state opted to discharge Matlock shortly thereafter.

plaintiff cannot bring a non-*habeas* civil action that would call into question the lawfulness of his detention. *Sheldon v. Hundley*, 83 F.3d 231, 233 (8th Cir. 1996). "For this Court to grant Mr. Curtiss relief, it would have to invalidate Mr. Curtiss's confinement. This is exactly what *Heck* prohibits." Most Plaintiffs seek discharge as a remedy in this lawsuit. In deposition testimony, others, like Paul Huston, want Phase advancement to transition or release with supervision. That relief is unavailable in this lawsuit.

(docket no. 71, p. 10-11).

At the outset, I note that defendants' reliance on *Curtiss* is misplaced. In that case, Curtiss argued that a state court's order that he be placed in transitional release, as opposed to release with supervision or complete discharge, violated his due process rights. Curtiss' argument was not unlike the one made by Matlock in the case the defendants' cited above. Judge O'Brien ruled,

> The issue before the Court in this case is *not* whether I.C.A. Section 229A is unconstitutional as applied or whether the treatment regime at CCUSO violates constitutional standards. The issue is specific to Mr. Curtiss' case and history. Mr. Curtiss asks this Court to look at Judge Ruigh's Order, overrule it, and allow Mr. Curtiss to be released . . . That is a habeas request, not a 42 U S.C. Section 1983 request. For this Court to grant Mr. Curtiss relief, it would have to invalidate Mr. Curtiss' confinement.

*Curtiss*, 2015 WL 728466, at *7, *aff'd sub nom. Curtiss v. McCormally*, 623 F. App'x 826 (8th Cir. 2015) (emphasis in original). Not only does Judge O'Brien highlight the distinction between Curtiss and these plaintiffs—Curtiss asked for direct release, these plaintiffs do not—Judge O'Brien seemingly anticipated the defendants' present argument and made clear that the *Heck* analysis would be different if the plaintiffs were broadly challenging Iowa Code Ch. 229A as applied.

Turning directly to the question of whether *Heck* would bar the plaintiffs' case, the answer is no. There is no request for relief in the plaintiffs' second amended complaint that asks me to invalidate a state court conviction or decision. As I pointed out above, these plaintiffs request structural changes at CCUSO, not direct release. Structural changes at CCUSO, which would provide better treatment or less punitive measures, would not invalidate the state court's finding that these individuals were, at the time they were committed, dangerous sexual offenders, or, at the time of their annual review(s), that they continued to pose a danger to society. Those questions are distinct and separate.

The defendants disagree, and argue that the plaintiffs do request direct release, citing to deposition testimony and pro se filings. However, even in those instances, the plaintiffs do not ask me to invalidate the state court findings that they are sexually violent offenders or continue to pose a danger. Rather, in those statements, the plaintiffs argue that CCUSO has improperly denied them progress (because of lack of treatment, etc.) and that the proper remedy for that violation is release. While that argument is misguided, and no court would ever order an inmate or patients' direct release because of structural issues at a state institution, that impossible remedy still would not invalidate the prior findings by the state court.

Finally, as Judge O'Brien stated in his order on the defendants' motion to dismiss, Judge Donovan Frank for the U.S. District for Minnesota recently completed a case similar to the present case. *See Karsjens v. Jesson*, 109 F. Supp. 3d 1139, 1144 (D. Minn. 2015), stating,

> [T]he Court conducted a lengthy trial over six weeks to determine whether it should declare that the Minnesota statutes governing civil commitment and treatment of sex offenders are unconstitutional as written and as applied. The Court concludes that Minnesota's civil commitment statutes and sex offender program do not pass constitutional scrutiny.

The overwhelming evidence at trial established that Minnesota's civil commitment scheme is a punitive system that segregates and indefinitely detains a class of potentially dangerous individuals without the safeguards of the criminal justice system.

In that case, the state argued *Heck* preclusion several times. In the initial discussion, Judge Frank stated,

Courts have allowed a § 1983 challenge when "'release was neither asked nor ordered.'" *Chancery Clerk of Chickasaw County v. Wallace*, 646 F.2d 151, 157 (5th Cir. 1981) (quoting *Gerstein v. Pugh*, 420 U.S. 103, n. 6, 95 S. Ct. 854, 43 L.Ed.2d 54 (1975) ("Because release was neither asked nor ordered, the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy.")); *see also Goldy v. Beal*, 429 F.Supp. 640, 644 (M.D. Pa. 1976) ("Because plaintiffs in this case do not request release from custody, they are not required to proceed by habeas corpus."). And in a challenge to a civil commitment statute, plaintiffs may seek a declaration that the statute under which they were committed is unconstitutional and an injunction enjoining defendants from enforcing and executing the statute in its present version. *See Goldy*, 429 F.Supp. at 645–46.

*Karsjens v. Jesson*, 6 F. Supp. 3d 958, 979, fn.21 (D. Minn. 2014). The *Wallace* case, states:

What the plaintiffs ask in this case is a constitutional evaluation under § 1983 of the procedures under which they were committed to state mental institutions and under which they are now held in state mental institutions. If constitutional defects in such procedures are found, then by virtue of the declaratory judgment which plaintiffs seek, each confined class member would become entitled to a review of his ongoing confinement under corrected procedures. If the District Court finds aspects of the Mississippi commitment procedures unconstitutional, it can suggest the basic constitutional requirements which must be met in dealing with involuntary confinement in mental institutions. If the

appropriate legislative body does not within a reasonable time provide such procedures the District Court may entertain applications for relief.

646 F.2d at 158. Judge Frank said that, additionally,

> the line of cases after *Preiser v. Rodriguez*, 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973), has demarcated relief that is available under § 1983 to individuals confined by the state under procedures claimed to be constitutionally infirm. *E.g., Wilkinson v. Dotson*, 544 U.S. 74, 81, 125 S. Ct. 1242, 161 L. Ed. 2d 253 (2005) ("[P]risoner's claim for an injunction barring future unconstitutional procedures did not fall within habeas' exclusive domain.") (citing *Edwards v. Balisok*, 520 U.S. 641, 648, 117 S. Ct. 1584, 137 L.Ed.2d 906 (1997)); Id. at 82, 125 S. Ct. 1242 (stating that the § 1983 prisoner action that would result in new parole hearing or new eligibility review may proceed because it would not "necessarily spell speedier release"); *Heck v. Humphrey*, 512 U.S. 477, 482–83, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (stating that a § 1983 action that would not determine the invalidity of an outstanding criminal judgment may proceed to challenge "wrong procedures" on denial of good-time credits); *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (permitting inmates to use § 1983 to obtain a declaration that disciplinary procedures are invalid, and "by way of ancillary relief[,] an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations").

*Karsjens*, 6 F. Supp. 3d at 979, n.21. Based on that analysis, Judge Frank concluded that, "while some injunctive relief may ultimately be awarded to both the class and individual members of the class, ultimate release from the detention at the MSOP may be required through habeas or procedures that may be mandated under 42 U.S.C. § 1983. Civil rights actions such as this one are an appropriate vehicle for challenges to civil commitment statutes, and declaratory and prospective injunctive reliefs are available in such cases." *Karsjens*, 6 F. Supp. 3d at 978.

Judge Frank revisited the issue in a subsequent order in the *Karsjens* case, and came to the same conclusion:

> Defendants contend that the Court's orders improperly challenge the fact and duration of Plaintiffs' commitment in violation of *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and *Heck v. Humphrey*, 512 U.S. 477 (1994). (Doc. No. 1039 at 24-26.) The Court has previously addressed these arguments, (see Doc. No. 580, Aug. 11, 2014 Order at 35-37 & n.21), finding this § 1983 class action proper notwithstanding the holdings of *Preiser* and *Heck*. The Court will not rehash its analysis here, but notes that its First Interim Relief Order demonstrates how this case is distinguishable from cases in which individuals challenge the validity of a state commitment or incarceration order. *See, e.g., Carter v. Bickhaus*, 142 Fed. Appx. 937, 938 (8th Cir. 2005) (applying *Preiser* and *Heck* and dismissing a committed individual's § 1983 claim because he sought "release from custody"). Here, Plaintiffs challenge deeply systemic problems in the overall operation of the MSOP, which have led to a system of indefinite and punitive detention contrary to the proper purpose of civil commitment. *See Kansas v. Hendricks*, 521 U.S. 346, 368-69 (1997). Consistent with what Plaintiffs have sought in this case, the Court's remedies do not directly order the release or transfer of any individual. Rather, the Court orders Defendants to complete assessments to ensure that those committed to the MSOP continue to meet the constitutional criteria for civil commitment outlined in *Call v. Gomez*, 535 N.W.2d 312, 318-19 (Minn. 1995) (i.e., that they continue to need treatment and pose a danger to the public). (Doc. No. 1035 at 39.)

*Karsjens v. Jesson*, 2015 WL 7432333, at *3 (D. Minn. 2015).

While the decisions in Minnesota are not precedential or binding on this court, and Judge Frank's decision is currently on appeal, I find no flaw in his logic or errors in the

cases to which he cites. For the reasons cited by Judge Frank, along with those discussed above, the plaintiffs' claims are not *Heck* barred.[11]

## F.    Is CCUSO Constitutional?

The defendants, next, argue that 1) CCUSO's treatment program does not violate constitutional standards; 2) CCUSO's application of IOWA CODE CH. 229(A) is constitutional as applied because it is not punitive; and 3) CCUSO is the least restrictive alternative. These arguments are all factual and, thus, summary judgment is only appropriate if there is truly no issue of material fact.

### 1.    Treatment program

Because plaintiffs are involuntarily committed patients, and not inmates incarcerated in prison or jail, the Fourteenth Amendment serves as a basis for their claims. *Revels v. Vincenz*, 382 F.3d 870, 874-75 (8th Cir. 2004); *see also Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001) (applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs); *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014) (stating, "[a]s a resident of CCUSO, Scott was a civilly committed individual, meaning any right to medical care arises under the Due Process Clause of the Fourteenth Amendment."). Patients have a liberty interest in receiving humane care. *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). "Persons who have been involuntarily committed are entitled to more

---

[11] In addition to the *Ireland* case in North Dakota, and *Karsjens* in Minnesota, Judge Audrey Fleissig for the U.S. District Court for Missouri recently heard a bench trial on a substantially similar case. While Judge Fleissig did not discuss *Heck* explicitly, she did note that one of the reasons the case was allowed to proceed beyond the summary stages is that, "[p]laintiffs do not challenge their initial commitment." *Van Orden v. Schafer*, 2015 WL 5315753, at *31, n.2 (E.D. Mo. 2015), *as amended* (Dec. 22, 2015), *on reconsideration in part sub nom. Orden v. Schafer*, 2015 WL 9269251 (E.D. Mo. 2015).

considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 322. Persons who are civilly confined may not be punished, but constraints on their liberty are permissible. *Id.* at 320; *Bell v. Wolfish*, 441 U.S. 520 (1979).

Beyond that, the parties dispute the applicable standard. The defendants make the (seemingly straightforward) argument that *Strutton*, 668 F.3d at 549, controls. *Strutton* dealt with the treatment at a civil commitment unit in Missouri. As set out in the defendants' brief, in that case:

> The Missouri program faced a shortfall and discontinued psychoeducational groups, doubled group size, and placed some patients on a waiting list. *Strutton*, 668 F.3d at 552-53. The Eighth Circuit explicitly rejected the contention that *Youngberg v. Romeo* controlled the analysis; instead, applying the "conscience shocking" standard in determining whether the patients were subject to a due process violation. *Strutton*, 668 F.3d at 557. "[W]e have held that although the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." *See Elizabeth M. v. Montenez*, 458 F.3d 779, 788 (8th Cir. 2006); *Bailey v. Gardebring*, 940 F.2d 1150, 1154 (8th Cir. 1991) (holding that the person who was civilly committed for purposes of safekeeping did not have a constitutional right to psychiatric treatment for pedophilia). The Court found, "temporary modifications in the treatment regimen of eliminating psychoeducational classes and increasing the size of process groups was neither arbitrary nor egregious. Rather, MSOTC sought to maintain essential treatment services in light of the challenges it faced." *Strutton*, 668 F.3d at 558.

(docket no. 71-1, p. 15-16). Accordingly, the defendants argue that CCUSO's treatment only fails the constitutional due process test if it "shocks the conscience."

The plaintiffs concede that *Strutton* is good law, but rely on analysis from Judge Frank to argue that these types of cases may offer an important distinction. As set out by Judge Frank:

> Defendants maintain that the proper legal standard to apply to Plaintiffs' inadequate treatment claim is whether "Defendants' treatment program is so arbitrary or egregious as to shock the conscience." (Doc. No. 376 at 22); *see Strutton v. Meade*, 668 F.3d 549, 557–58 (8th Cir.2012). It is true that the Eighth Circuit concluded in *Strutton* that the plaintiff "[did] not have a fundamental due process right to sex offender treatment" and that, accordingly, the *Youngberg* "professional judgment" standard did not apply to his treatment-related claims. *Strutton*, 668 F.3d at 557. The *Strutton* court rejected the rule in some circuits that due process requires that civilly committed individuals be provided "with access to mental health treatment that gives them a realistic opportunity to be cured and released," and instead noted that, "although the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, it has not recognized a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." *Id*. (internal quotation omitted). In *Strutton*, however, the plaintiff's claims were limited to his access to treatment; he neither raised a systemic challenge to the implementation of the program as a whole, nor did he allege that his confinement was punitive in nature. *See id*. at 558 (determining that "the temporary modifications in the treatment regimen of eliminating psychoeducational classes and increasing the size of process groups was neither arbitrary nor egregious") Prior to *Strutton*, the Eighth Circuit applied the *Youngberg* professional judgment standard to a sex offender's right to treatment claims. *See Bailey v. Gardebring*, 940 F.2d 1150, 1153–54 (8th Cir. 1991). In *Bailey*, the Eighth Circuit determined that the plaintiff could succeed on his claim only if he could "show that the 'presumptively valid' decision of the hospital psychiatrists not

> to provide the sort of treatment" sought by the plaintiff was
> "'such a substantial departure from accepted professional
> judgment, practice, or standards as to demonstrate that the
> person responsible actually did not base the decision on such
> a judgment.'" *Id*. at 1154 n. 4 (quoting *Youngberg*, 457 U.S.
> at 323, 102 S. Ct. 2452). Ultimately, the Eighth Circuit
> affirmed the district court's finding that there was
> "insufficient evidence for a reasonable fact finder to conclude
> that the DHS defendants' decisions were a substantial
> departure from accepted professional practice." *Bailey*, 940
> F.2d at 1154 n. 4 (internal quotation omitted).

*Karsjens*, 6 F. Supp. 3d at 933-34. However, I do not see the ambiguity in the Eighth

Circuit Court of Appeals's decision that Judge Frank does. In *Strutton*, the Eighth Circuit

Court of Appeals made clear that the conscience shocking standard is the approach that

will be adopted in this circuit.

> [The *Youngberg* court] did not address the question of whether
> an individual "committed for care and treatment under state
> law … has a state substantive right to habilitation, which is
> entitled to substantive … protection under the Due Process
> Clause of the Fourteenth Amendment." *Id*. at 316 n. 19, 102
> S. Ct. 2452. Since *Youngberg*, some circuits have adopted a
> rule that "the Fourteenth Amendment Due Process Clause
> requires states to provide civilly-committed persons with
> access to mental health treatment that gives them a realistic
> opportunity to be cured and released." *Sharp v. Weston*, 233
> F.3d 1166, 1172 (9th Cir. 2000) (citing *Ohlinger v. Watson*,
> 652 F.2d 775, 778 (9th Cir. 1980)). We have not adopted
> such an approach. Instead we have held that although "the
> Supreme Court has recognized a substantive due process right
> to reasonably safe custodial conditions, [it has not recognized]
> a broader due process right to appropriate or effective or
> reasonable treatment of the illness or disability that triggered
> the patient's involuntary confinement." *See Elizabeth M. v.
> Montenez*, 458 F.3d 779, 788 (8th Cir.2006); *Bailey v.
> Gardebring*, 940 F.2d 1150, 1154 (8th Cir. 1991) (holding
> that person who was civilly committed for purposes of safe-

keeping did not have a constitutional right to psychiatric treatment for pedophilia), *see also Kansas v. Hendricks*, 521 U.S. 346, 366, 117 S. Ct. 2072, 138 L.Ed.2d 501 (1997) ("[W]e have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available."). *The district court was correct that* Strutton *does not have a fundamental due process right to sex offender treatment. Accordingly,* Youngberg's *"professional judgment" standard does not apply to this case. Strutton's* due process claim originates from the state statutory mandate to provide for Strutton's confinement "for control, care and treatment until such time as [his] mental abnormality has so changed that [he] is safe to be at large." Mo.Rev.Stat. § 632.495(2). We remain cautious not to turn every alleged state law violation into a constitutional claim. Only in the rare situation when the state action is "truly egregious and extraordinary" will a substantive due process claim arise. *See Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104–05 (8th Cir. 1992). This is why the district court properly analyzed Strutton's claims to determine whether the state action of eliminating the psychoeducational classes and modifying the process groups was so arbitrary or egregious as to shock the conscience.

*Strutton*, 668 F.3d at 557-58 (emphasis added). This fits with the Eighth Circuit Court of Appeals's long standing practice of applying the stricter standard in 42 U.S.C. § 1983 cases. *See Scott*, 742 F.3d at 339, applying the deliberate indifference standard to civil detainee cases, as opposed to the more generous professional judgment standard. Accordingly, the question in this case is whether or not CCUSO's treatment program shocks the conscience.[12]

---

[12] I note that there may well be new precedent from the Eighth Circuit Court of Appeals on this issue after they rule on the *Karsjens* case. Accordingly, the parties may brief any subsequent change in the standard prior to trial.

The defendants make a detailed factual argument about how CCUSO treatment does not shock the conscience. The defendants argue that, at most, some of the therapists are behind on paperwork, but the plaintiffs still receive adequate treatment. Defendants also argue that there is no national consensus regarding how many patients a therapist should see, or whether individual therapy is better than group therapy.

The defendants also set out treatment issues with various plaintiffs. For example, defendants argue that:

> Taft and Huston admit to arguing and try to bargain for advancement in phases for things like arguing less (Huston) and withdrawing lawsuits (Taft). Taft admits to tampering with the fire alarm just to mess with staff. Huston admits to stealing a bloody tampon with the intent of masturbating to it. There are good reasons some patients are at higher Phases in the program and not others.

(docket no. 71-1, p. 19).

I have no doubt that some of the plaintiffs—many of whom are repeat sex offenders—have behavioral issues. However, this case is not about how bad the plaintiffs are. This case is about the quality of the defendants' program. Keeping that distinction in mind, I find that the plaintiffs have raised a material factual dispute about the quality of the treatment. As set out by the plaintiffs:

> The testimony of the CCUSO therapists – in particular, the testimony of Steve Tjaden, mirrors the testimony of the witnesses in *Karsjens*. Massive shortages and turnover of therapists at CCUSO has caused significant problems and delays in treatment, which has negatively affected patient progress. Required evaluations are done months after their due date, which is also impeding the progress of patients through the program. No individual counseling is done, other than on an emergency basis, and group therapy suffers due to the patient/therapist ratio which is more than double that which is required for treatment to be effective. The testimony of the plaintiffs, Damon Willis in particular, notes how the

> turnover of staff, inconsistency, and lack of treatment has had
> consequences on progress of patients through CCUSO,
> prolonging their indefinite commitment to CCUSO.

(docket no. 79-1, p. 12-13). Additionally, the record has evidence that a pastor with no real experience with sexual offenders was drafted into service as a primary therapist *for years*. Almost across the board, the defendants themselves testified that the quality of care at CCUSO has been declining, as the ratio of patients to staff reversed, the former constantly growing, the later constantly declining. When considering that these patients will spend the rest of their lives locked away unless they receive quality care, these allegations certainly could shock the conscience. Because the plaintiffs have made sufficient allegations that CCUSO's treatment could shock the conscience, the defendants' motion for summary judgment is denied.

I want to make two additional points on this issue. Many types of 42 U.S.C. § 1983 cases are well trod, which is to say there is substantial case law that anticipates most fact situations. If the case is excessive force, there is binding precedent about how many times a state actor can punch an inmate before it violates the constitution. If the case is deliberate indifference to a serious medical need, there is case law discussing just how long a prison doctor can leave a tumor untreated before the care runs afoul of the Fourteenth Amendment. But this case offers the rare situation where there is very little precedent discussing what sort of (lack of) treatment would shock the conscience. The one case, Strutton, clearly has a factual distinction with the plaintiffs' case. In *Strutton*, the Eighth Circuit Court of Appeals found that short term staffing shortages did not shock the conscience. In this case, the staffing shortage has been growing for years, to the point where the remaining staff members are leaving because CCUSO will not hire more help. In a situation where there is little case law, I must be especially cautious about making a summary finding about a factual dispute.

Second, *Strutton* was not the final word on the quality of care in Missouri's sex offender program. As cited above, Judge Fleissig in Missouri recently held a bench trial on a nearly identical case regarding care for sex offenders, where the plaintiffs argued that they were not receiving quality sex offender treatment. Judge Fleissig considered the appropriate standard and found that "shock the conscience" applied. *See Van Orden*, 2015 WL 5315753, at 26, stating, "[p]laintiffs cannot prevail on their first type of as-applied claims unless they prove that the treatment at SORTS is so lacking as to shock the conscience. *Strutton*, 668 F.3d at 558." Again, although the Missouri case is not dispositive or binding, it is persuasive in so far as that district court looked at the same situation as the Eighth Circuit Court of Appeals in *Strutton*, applied the stricter standard, and allowed the case to proceed to trial.

### 2. *Punitive as applied*

The defendants next argue that the Supreme Court has already ruled against the plaintiffs' claim that civil commitment for sex offenders is punitive, citing *Kansas v. Hendricks*. However, as discussed above, Justice Kennedy clearly held open the possibility that sex offender civil commitment could become punitive in nature, and if it did, he stated that it could violate due process.

The defendants seemingly concede the possibility that a civil commitment program could be found unconstitutionally punitive, and spend the bulk of their argument discussing how the *Karsjens* case is factually distinct because Minnesota and Iowa's sexual offender laws are somewhat different.[13] Ultimately, the defendants may well be

---

[13] The defendants also cite *In re Det. of Garren*, 620 N.W.2d 275, 283 (Iowa 2000) in support of the proposition that the Iowa Supreme Court already found CCUSO's program not punitive. However, there are two important distinctions. The first is that *Garren* was decided shortly after CCUSO opened. The Iowa Supreme Court could not

correct. There are important distinctions. Iowa's SVP program allows for annual judicial review in the Iowa state court. Minnesota's SVP program had no such mechanism. Additionally, for as few patients that have been released from CCUSO, even fewer patients were released in Minnesota. But, again, those are a factual distinctions. As Judge O'Brien stated in his previous order:

> The allegation is that Iowa's program, as enacted under I.C.A. Section 229A and carried out by the Defendants has become punitive in nature. The Plaintiffs also allege that the Defendants fail to employ the least restrictive means available to achieve the I.C.A. Section 229A's goals. These are all factual questions. It is possible that the Defendants could be acting unconstitutionally, as set out in the Plaintiffs' Complaint, even if previous Courts approved certain SVP programs. The fact that an SVP program may become punitive is even acknowledged by the Hendricks decision that the Defendants rely so heavily upon.

(docket no. 51, p. 15-16). Judge Frank in Minnesota stated essentially the same thing:

> At the center of Plaintiffs' challenge to the Minnesota sex offender commitment scheme is the allegation that a commitment to MSOP essentially amounts to lifelong confinement, equivalent to a lifetime of criminal incarceration in a facility resembling, and run like, a medium to high security prison. Under such conditions, and assuming the allegations in the Complaint to be true, it appears that MSOP may very well be serving the constitutionally impermissible purposes of retribution and deterrence.

*Karsjens*, 2014 WL 667971 *7. More importantly, Judge Frank ultimately found that Minnesota's program was punitive. "After applying the strict scrutiny standard, the

_____

consider as applied facts in that case, because CCUSO had virtually no history to evaluate. The longest a patient could have been there in 2000 was two years. Second, the *Garren* case dealt specifically with one patient, and was considered solely through the lens of whether commitment to CCUSO punished Garren. The present case has numerous different plaintiffs.

Court concludes that Minnesota's civil commitment statutory scheme is not narrowly tailored and results in a punitive effect and application contrary to the purpose of civil commitment and that the MSOP, in implementing the statute, systematically continues to confine individuals in violation of constitutional principles." *Karsjens*, 109 F. Supp. 3d at 1173. (D. Minn. 2015). So did Judge Fleissig in Missouri:

> The Court concludes that the effect of this deficiency has been to turn civil confinement into punitive, lifetime detention of SORTS residents, in violation of the Due Process Clause. *See Hendricks*, 521 U.S. at 373, 117 S.Ct. 2072 (Kennedy, J., concurring); *Karsjens*, --- F.Supp.3d at ----, 2015 WL 3755870, at *31 (finding that Minnesota's civil commitment program for sex offenders was unconstitutionally punitive, as applied, because individuals remained confined even when, as a result of treatment progress or physical infirmity, they had reduced their risk below the level required for commitment).

*Van Orden*, 2015 WL 5315753, at *29.

In this case, the record is replete with evidence that could tend to show CCUSO has become punitive. Several of the plaintiffs have been at CCUSO for more than a decade, but have never progressed past Phase II. Taft, for example. CCUSO's Handbook has detailed behavioral rules, many of which have nothing to do with the plaintiffs' status as sexual offenders. Among "major" rule violations are theft, disrespect to staff, lying to staff, fighting with other patients, and misuse of property. (docket no. 72-1, p. 56)). As set out above, advancement through almost every Phase requires a patient to be free of behavioral reports for a considerable period of time. Under the rules as written, a patient could receive a virtual life sentence at CCUSO by periodically stealing a pack of gum from a fellow patient, so long as the associated behavioral report kept the patient from advancing to the next Phase. Clearly, although theft is generally discouraged, it is a crime that would rarely result in a life sentence. Theft has nothing to do with whether or not a patient continues to pose a threat as a sex offender. Finally,

there is testimony in the record which indicates that patients are not progressing through the treatment Phases simply because there is not enough staff to treat them. This is also evidence that CCUSO has become punitive in nature. Accordingly, I find that whether or not the CCUSO program has become punitive as applied is a factual question and the plaintiffs have alleged a genuine issue of material fact. The defendants' motion for summary judgment is denied.

### 3. *Least restrictive alternative*

The defendants' next argument is that CCUSO is the least restrictive means of achieving important state goals. The defendants argue that CCUSO comports with IOWA CODE CH. 229A and that earlier state court cases have affirmed CCUSO's procedures.

Both the *Karsjens* court and the *Van Orden* court allowed the question of whether or not the civil commitment program was the least restrictive alternative to proceed to trial. In *Van Orden*, Judge Fleissig discussed whether it was appropriate to have Missouri's version of transitional release patients housed behind the barbed wire at their facility, similar to CCUSO's transitional release housing, and stated:

> The evidence established that there are residents at SORTS, including some in the Annex, who could be safely placed in the community or in a less restrictive facility outside the secure perimeter of SORTS. These include aged and infirm residents, as well as residents who have successfully completed all treatment phases within the SORTS facilities.

*Van Orden*, 2015 WL 5315753, at *16. In this case, there are numerous allegations of ways in which CCUSO's program could be done differently. For example, providing individualized therapy to patients who would benefit from it. I am persuaded that whether or not various aspects of CCUSO's program are the least restrictive alternatives is a question properly reserved for trial.

### G.     Qualified Immunity

The defendants argue that they are entitled to qualified immunity.  The Eighth Circuit Court of Appeals has observed,

> Qualified immunity shields government officials from civil liability insofar as their conduct in performing discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Qualified immunity provides "ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986), and protects "all but the plainly incompetent or those who knowingly violate the law," *Id*. at 341, 106 S. Ct. 1092.  "To overcome the defense of qualified immunity the plaintiff must show: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).

*Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014).  A defendant is entitled to qualified immunity if the right that defendant violated was not "clearly established" at the time of the defendant's actions.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.

In this case, the defendants are clearly entitled to qualified immunity.  As was made clear by the discussion above, although plaintiffs obviously have due process rights, the extent of those rights in the context of the sex offender civil commitment system are not clearly established.  Additionally, to the extent precedent exists, it has affirmed programs similar to CCUSO, and actions similar to those taken by the defendants.  In

*Kansas*, 521 U.S. at 371 the Supreme Court affirmed a facially similar civil commitment arrangement. In *Strutton*, 668 F.3d at 557-58, the Eighth Circuit Court of Appeals stated that lulls in treatment caused by staffing shortages did not shock the conscience or violate the constitution. In *Linehan v. Milczark*, 315 F.3d 920, 929 (8th Cir. 2003), the Eighth Circuit Court of Appeals affirmed a state court finding that whether a patient "lack[ed] [] adequate control" over their behaviors, was a constitutionally sufficient standard upon which to order them civilly committed. In *Senty-Haugen v. Goodno*, 462 F.3d 876, 888 (8th Cir. 2006), the Eighth Circuit Court of Appeals found that placing a civilly committed patient in isolation did not violate due process and, even if it did, the court specifically stated that qualified immunity would still apply because rights related to civil commitment were not clearly established.[14] Thus, even viewing the facts most favorably to the plaintiffs, they have failed to establish that the rights at issue were clearly established.

However, qualified immunity only applies to claims for money damages. As the Eighth Circuit Court of Appeals has stated,

> "We note that the doctrine of qualified immunity does not apply to [plaintiff's] claim[ ] for … injunctive relief." *Curtiss*, 583 Fed. Appx. at 599 (citing *Burnham v. Ianni*, 119 F.3d 668, 673 n. 7 (8th Cir. 1997) (en banc) (explaining that an appeal from the denial of qualified immunity implicated only liability for money damages and that qualified immunity would not protect the defendant from claims for injunctive or other equitable relief); *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) (stating that "qualified immunity does not apply to claims for equitable relief")).

---

[14] The finding that a right is not clearly established is much different from a finding that a right does not exist. Accordingly, the finding that the rights allegedly at issue in the case are not "'clearly established'" is in no way a reflection on how the court will ultimately rule after a trial.

*Mead v. Palmer*, 794 F.3d 932, 937 (8th Cir. 2015).  Accordingly, the plaintiffs' claims for injunctive relief will be allowed to proceed.

### H.        *Personal Responsibility*

Next, the defendants argue that certain defendants are not personally responsible. Essentially the defendants argue that Dr. Smith was the defendant with the most control over the issues in the second amended complaint.

The standard regarding personal responsibility is straightforward.  Defendants are only liable for actions for which each is directly responsible.  *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990).

Regarding defendant Palmer, the plaintiffs correctly note that he had ultimate control of the budget at CCUSO, and ultimate control for the operation of the facility. Clearly, he could have personal responsibility for some of the alleged wrong acts. Importantly, he would also be a proper defendant to implement injunctive relief if the plaintiffs prevail in this case.  Accordingly, the defendants' motion to dismiss him is denied.

Regarding Dr. Smith, the plaintiffs have clearly alleged facts which show that he had operational control of CCUSO for most of the time at issue in this case.  Accordingly, he is a proper defendant.  However, the defendants note that Dr. Smith is no longer in a position to implement policy changes at CCUSO.  There is some discussion in the pleadings about the parties possibly substituting the current director of CCUSO for Dr. Smitth.  If the parties choose to file it, I will give a substitution motion due consideration.

Regarding the therapists, Dr. Loescher, Matt Royster, William Turner, Robert Stout, and Steve Tjaden, the evidence supports claims against each of them.  One of the plaintiffs' primary claims is that treatment at CCUSO is constitutionally deficient.  Each

of the therapist defendants testified about treating various plaintiffs. Accordingly, they will remain as defendants in this case.

## I.    *Contract Claims*

In their second amended complaint, the plaintiffs argue that unspecified defendants have committed a breach of contract. Defendants' move to dismiss that claim as unsupported by the facts or the law. They argue that breach of contract claims should be heard in state court unless there is an independent basis for jurisdiction. *Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005).

Plaintiffs' argument seems to be that the patient Handbook constitutes a binding contract regarding the terms of release, and the defendants have violated that contract. However, this claim seems to be based on a misreading of Judge O'Brien's original IRO, where he stated, "this Court has seen a number of cases from patients at CCUSO raising similar claims. Mr. Matlock has presented a persuasive argument that he, and other CCUSO patients, may have developed a liberty interest under the various rules, handbooks, and procedures promulgated by the administrators of CCUSO." (docket no. 8). Judge O'Brien was not allowing Matlock's claim to proceed for the tort of breach of contract. Rather, Judge O'Brien was summarizing one of the reasons that he felt that the plaintiffs may have a valid claim that CCUSO has become punitive. His reasoning being that because CCUSO failed to comply with its own rules for releasing patients, it had become punitive. Regardless, the plaintiffs have failed to make any argument or cite any facts that support their breach of contract claim. As set out above, once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley*, 415 F.3d at 910. To prevail on a breach-of-contract claim, plaintiffs must prove the following elements: (1) the existence of a contract, (2)

the terms and conditions of the contract, (3) performance of all the terms and conditions required under the contract (or excuse from such performance), (4) the defendants' breach of the contract in some particular way, and (5) damage as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). Plaintiffs have failed to allege any of those elements. In their resistance, the plaintiffs' entire argument is the statement that the patient Handbook constitutes a binding contract. Plaintiffs failed to allege any actual elements of a breach of contract. Accordingly, the defendants' motion for summary judgment regarding plaintiffs' claim for breach of contract is granted.

## J.   Money Damages

Defendants' final argument is that the Eleventh Amendment bars suits for money damages against officials of the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[T]he Eleventh Amendment bars suits in federal court 'by private parties seeking to impose a liability which must be paid from public funds in the state treasury.'" (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). The claims against the state defendants in their official capacities are claims against the State of Iowa. *Leventhal v. Schaffer*, 2008 WL 111301 *4 (N.D. Iowa 2008). "When a state is directly sued in federal court, it must be dismissed from litigation upon its assertion of Eleventh Amendment immunity. . . ." *Barnes v. Missouri*, 960 F.2d 63, 64 (8th Cir. 1992). In this case, the plaintiffs sued the defendants in their individual capacities, but agreed that the state actors would be immune from a claim for money damages in their official capacity. (docket no. 79-1, p. 22). However, this issue is moot because I have granted the defendants' motion for summary judgment on the issue of qualified immunity.

### III. CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment (docket no. 71) is **granted in part and denied in part**. The defendants' motions for summary judgment arguing that the court should abstain from this case are **denied**. Similarly, the defendants' motion arguing that the doctrine articulated in *Heck v. Humphrey* bars this suit is **denied**. The plaintiffs have alleged a genuine issue of material fact that 1) CCUSO's treatment program violates constitutional standards; 2) CCUSO's application of I.C.A. § 229(A) is punitive as applied; and 3) CCUSO is the not least restrictive way to treat sex offenders. The defendants' motion for summary judgment on those issues is denied and they will be allowed to proceed to trial. However, the defendants are entitled to qualified immunity and their motion for summary judgment on that issue will be **granted**. Accordingly, the plaintiffs' claims for monetary damages are **dismissed**. Only plaintiffs' claims for injunctive relief will proceed to trial. The plaintiffs have stated a valid claim against each defendant. Accordingly, defendants' motion for summary judgment that defendants other than Jason Smith be dismissed for lack of personal responsibility is **denied**. Next, the plaintiffs have failed to state a claim for breach of contract. Accordingly, that portion of the defendant's motion for summary judgment is **granted** and that claim is **dismissed**. Finally, the defendants' motion for summary judgment regarding Eleventh Amendment immunity is **denied** as moot.

**IT IS SO ORDERED**.

**DATED** this 30th day of March, 2016.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA