**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DAMON WILLIS, CALVIN MATLOCK, HAROLD D. WILLIAMS, DAVE L. TAFT, JR., PAUL HUSTON, SYVENO J. WRIGHT, EDDIE C. RISDAL, DONALD E. PHILLIPS, and MICHAEL MILLSAP,

        Plaintiffs,

vs.

CHARLES PALMER and CORY TURNER,

        Defendants.

No. C12-4086-MWB
(Lead Case)

**OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

I.    **INTRODUCTION**.................................................................. 2

II.   **PROCEDURAL HISTORY** ................................................... 2

III.  **THE** KARSJENS **DECISION** ............................................ 4

IV.  **FACTUAL FINDINGS** ........................................................ 17
     A.    *Dr. Wilson's Report* .................................................. 17
     B.    *Dr. Schlank's Report* ............................................... 31

V.   **ANAYLSIS** ......................................................................... 35
     A.    *The Parties' Arguments* ............................................ 35
     B.    *As Applied Due Process Challenge in light of* Karsjens.................. 37
          1.    *Fundamental Liberty Interest* .......................... 37
          2.    *Shocks the Conscience* .................................. 41
     C.    *Whether CCUSO is Punitive and the Least Restrictive Alternative*................................................... 48

VI.  **CONCLUSION** .................................................................. 50

# I.    INTRODUCTION

In this case, plaintiffs, civilly detained patients at Iowa's Civil Commitment Unit for Sexual Offenders (CCUSO), argue that their civil rights have been violated and bring suit pursuant to 42 U.S.C. § 1983.  The case is once again before me on a second Motion for Summary Judgment (docket no. 127) filed by the defendants.  For the reasons set out below, principally further factual development in the record and new case law from the Eighth Circuit Court of Appeals, I find that the Motion should be granted.

# II.    PROCEDURAL HISTORY

As the parties are aware, I granted in part and denied in part defendants' first Motion for Summary Judgment on March 30, 2016. (docket no. 81).  In that order, I set out the complicated history of this case up to that point.  Accordingly, I now review only subsequent developments in the case.

In my ruling on the defendant's first Motion for Summary Judgment, I granted defendants' motion on two claims.  First, I dismissed plaintiffs' contract claims.  (docket no. 81, p. 54).  Second, I granted defendants' motion that they were entitled to qualified immunity.  (docket no. 81, p. 51).  Accordingly, I dismissed plaintiffs' claims for money damages.  However, I denied defendants' motion that plaintiffs' claims were barred by the doctrines set out in *Younger v. Harris*, 401 U.S. 37 (1971), *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) or *Heck v. Humphrey*, 512 U.S. 477 (1994). (docket no. 81, p. 20-35).  Additionally, I denied defendants' motion on three of plaintiffs' claims for injunctive relief.  The remaining claims are:

> 1) does CCUSO's treatment program violate the constitutional "shock the conscience" standard; 2) is CCUSO's application of Iowa Code § 229(A) punitive; and 3) are the procedures at CCUSO the least restrictive alternative for committing sexual offenders. . .

(docket no. 91, p. 8-10).

Following my ruling on summary judgment, defendants filed a limited motion to reconsider, arguing that certain defendants should be dismissed from the case. (docket no. 82). However, the issues raised in that motion were resolved when plaintiffs filed a Second Amended Complaint. (docket no. 89). Pursuant to that Second Amended Complaint, the plaintiffs voluntarily dismissed all defendants other than Charles Palmer and Cory Turner. Additionally, the plaintiffs reframed their claims in light of my earlier ruling.

Following a status conference with the parties, I became concerned about the complex issues remaining in the case and the lack of expert testimony. Accordingly, I raised the issue of the court appointing its own expert witness. (docket no. 91). On June 20, 2016, I entered an order directing the parties to jointly nominate potential expert witnesses to be appointed by the court pursuant to Federal Rule of Evidence 706. (docket no. 95). The defendants filed a notice of appeal shortly thereafter, challenging both the appointment of an expert and the manner in which I had proposed the expert be compensated. (docket no. 98). The defendants then filed a motion to stay the case, including all deadlines, pending the appeal. (docket no. 104). I granted the defendants' motion and instructed the parties to submit a new scheduling plan within seven days after disposition of that appeal. On January 4, 2017, the Eighth Circuit Court of Appeals dismissed defendant's appeal for lack of jurisdiction and instructed me to reevaluate the issue in light of the decision in *Karsjens v. Piper*, 845 F.3d 394, 398 (8th Cir.), *cert. denied*, 138 S. Ct. 106, 199 L. Ed. 2d 185 (2017). (docket no. 107).

On January 23, 2017, I, along with Chief Magistrate Judge C.J. Williams, held a telephonic conference with counsel regarding scheduling issues. During that conference, I informed the parties that the court would pay for the Rule 706 expert out of the court's own funds. I also informed the parties that I would allow the defendants to file a renewed motion for summary judgment after the Rule 706 expert's report had been filed and the

parties' experts had been designated. Following the status conference, Judge Williams issued a series of orders directing the nomination of an expert witness. On April 25, 2017, Judge Williams reviewed the nominees and decided to appoint Dr. Robin J. Wilson as the court's Rule 706 expert. (docket no. 114). Shortly thereafter, Judge Williams entered an order (docket no. 115) setting May 1, 2018, as the new deadline for filing dispositive motions.

Dr. Wilson submitted his report on October 10, 2017. (docket no. 117). Defendants filed the present second Motion for Summary Judgment (docket no. 127) on April 25, 2018. Included in defendants' Appendix (docket no. 129-1) was an expert report from Dr. Anita Schlank. The plaintiffs filed a resistance (docket no. 134) on May 25, 2018. Defendants then filed a reply (docket no. 135) on June 1, 2018.[1]

### III. THE KARSJENS DECISION

In my ruling on defendants' first Motion for Summary Judgment, I set out the relevant summary judgment standards and need not repeat them here. I also discussed both the applicable Supreme Court precedent and the controlling portions of the Iowa Code.[2] Similarly, I set out the important Eighth Circuit cases related to due process and civil commitment programs.[3] Accordingly, my discussion in this order will focus on the two decisions which were issued since that order which affect my analysis.[4]

---

[1] I omit discussion of other events – including protracted disputes over protective orders – as not relevant to the present motion.

[2] *See Kansas v. Hendricks*, 521 U.S. 346 (1997) and Iowa Code § 229A.

[3] *See e.g. Strutton v. Meade*, 668 F.3d 549 (8th Cir. 2012).

[4] Although my discussion, here, is limited to the two relevant federal court cases, the plaintiffs cite, for good reason, a recent Iowa Supreme Court case, *In re Det. of Wygle*, 910 N.W.2d 599 (Iowa 2018). That case dealt with whether the state improperly brought

a civil commitment action after a defendant had been released from custody. The Iowa Supreme Court found that commitment was improper under the relevant statute because the defendant had been discharged from custody and dismissed the commitment proceedings. *Wygle*, 910 N.W.2d at 619. While that holding is not directly relevant to this case, the Iowa Supreme Court did engage in a lengthy discussion regarding the history of sex offender civil commitment. The court was sharply critical of civil commitment statutes and the federal court precedent allowing the amorphous 'mental abnormality' standard to survive constitutional scrutiny:

> Given the interests at stake and the problems implementing SVP statutes, it is not surprising that the Kansas Supreme Court and a federal district court came to the conclusion that SVP statutes did not pass constitutional muster. *In re Care & Treatment of Hendricks*, 259 Kan. 246, 912 P.2d 129, 138 (1996), *rev'd sub nom. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501; *Young v. Weston*, 898 F.Supp. 744, 751 (W.D. Wash. 1995). In *Young*, the Washington State Psychiatric Association submitted an amicus brief arguing that the notion of a "sexually violent predator" is not a medical concept but an "unacceptable tautology." 898 F.Supp. at 750.

> Notwithstanding the opposition of the APA and ABA, the United States Supreme Court, by a 5–4 margin, upheld the Kansas SVP statute in *Hendricks*, 521 U.S. 346, 117 S.Ct. 2072. Justice Thomas concluded that the term "mental abnormality" was sufficiently narrow to satisfy due process even though it did not amount to a mental illness as previously required for civil commitment in the Court's precedents *Addington* and *Foucha*. *Hendricks*, 521 U.S. at 358–60, 117 S.Ct. at 2080–81; *see id*. at 374, 117 S.Ct. at 2088 (Breyer, J., dissenting). In a cautionary and arguably prescient concurring opinion, however, Justice Kennedy emphasized that if the term "mental abnormality" proved to be too imprecise, the precedents of the Court "would not suffice to

In my previous order, I discussed the then ongoing cases regarding North Dakota, Missouri, and Minnesota's sex offender commitment systems. *See Ireland v. Anderson*, 2014 WL 3732014 (D. N.D. 2014), *Van Orden v. Schafer*, 129 F. Supp. 3d 839, 841 (E.D. Mo. 2015) and *Karsjens v. Jesson*, 109 F. Supp. 3d 1139, 1144 (D. Minn. 2015). In the latter two cases, federal district courts conducted trials and found that the sex offender civil commitment systems in those states violated patients' due process rights.

The *Karsjens* case, from Minnesota, was appealed to the Eighth Circuit Court of Appeals.[5] In 2017, the Eighth Circuit Court of Appeals reversed the district court. In so doing, the Eighth Circuit Court of Appeals first considered the question of whether *Heck* or one of the related doctrines barred civilly committed plaintiffs from pursuing these types of due process claims in federal court. The Eighth Circuit Court of Appeals

---

validate it." *Id.* at 373, 117 S.Ct. at 2087 (Kennedy, J., concurring).

*Wygle*, 910 N.W.2d at 605. The Iowa Supreme Court's dicta may give the plaintiffs hope that, while the present federal claim fails, a renewed state court effort based on the due process clause contained in the Iowa state constitution may yield results. *See State v. Short*, 851 N.W.2d 474, 483 (Iowa 2014), stating "there is powerful evidence that the Iowa constitutional generation did not believe that Iowa law should simply mirror federal court interpretations. . ." and explaining that the Iowa constitution's due process clause has been broader than its federal counterpart since the time of the Fugitive Slave Law; *see also Swanson v. Civil Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 307–08 (Iowa 2007), (denying a due process attack on the civil commitment statute but stating "our discussion of the Due Process Clause of the Fourteenth Amendment is equally applicable to Swanson's Iowa constitutional claim *because Swanson has not given us any reason to interpret the federal and Iowa due process clauses differently*. . ." (emphasis added).)

[5] For a detailed discussion of the history of the *Karsjens* case see both my prior order and Eric S. Janus, *Beyond Strict Scrutiny: Forbidden Purpose and the "Civil Commitment" Power*, 21 New Crim. L. Rev. 345, 346 (2018).

found, as I previously did, that those doctrines did not bar suit. *Karsjens*, 845 F.3d at 405-407.

The Eighth Circuit Court of Appeals then considered the proper standard in a facial due process challenge.

> The United States Constitution guarantees that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Supreme Court has not expressly identified the proper level of scrutiny to apply when reviewing constitutional challenges to civil commitment statutes." *United States v. Timms*, 664 F.3d 436, 445 (4th Cir.), *cert. denied*, --- U.S. ----, 133 S.Ct. 189, 184 L.Ed.2d 237 (2012). However, to date, the strict scrutiny standard applied by the district court is reserved for claims of infringements on "fundamental" liberty interests upon which the government may not infringe "unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). According to the Supreme Court, "fundamental rights and liberties" are those "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal citations and quotation marks omitted).
>
> Although the Supreme Court has characterized civil commitment as a "significant deprivation of liberty," *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), it has never declared that persons who pose a significant danger to themselves or others possess a fundamental liberty interest in freedom from physical restraint. *See Foucha v. Louisiana*, 504 U.S. 71, 116, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting) (criticizing the majority's analysis of a due process challenge

to a civil commitment statute because, "[f]irst, the Court never explains whether we are dealing here with a fundamental right, and … [s]econd, the Court never discloses what standard of review applies"). Rather, when considering the constitutionality of Kansas's Sexually Violent Predator Act, the Court stated "[a]lthough freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' that liberty interest is not absolute." *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (quoting *Foucha*, 504 U.S. at 80, 112 S.Ct. 1780). The Court noted that many states provide for the involuntary civil commitment of people who are unable to control their behavior and pose a threat to public health and safety, and "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." *Id*. at 357, 117 S.Ct. 2072 (citing *Addington*, 441 U.S. at 426, 99 S.Ct. 1804). When considering the due process implications of a civil commitment case, the Supreme Court stated "[a]t the least, due process requires that the nature and duration of commitment bear some *reasonable relation* to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (emphasis added).

Accordingly, the proper standard of scrutiny to be applied to plaintiffs' facial due process challenge is whether MCTA bears a rational relationship to a legitimate government purpose.

*Karsjens*, 845 F.3d at 407–08. Applying that standard, the Eighth Circuit Court of Appeals found:

The district court announced six grounds upon which MCTA was facially unconstitutional under the strict scrutiny standard—(1) MCTA did not require periodic risk

assessments of all committed persons, (2) MCTA did not provide for a judicial bypass mechanism, (3) MCTA rendered discharge from MSOP more onerous than admission because discharge criteria was more stringent than admission criteria, (4) MCTA impermissibly shifted the burden to petition for a reduction in custody to the committed person, (5) MCTA did not provide less restrictive alternatives although the statute indicated such would be available, and (6) MCTA did not require state officials to petition for a reduction in custody on behalf of committed individuals who might qualify for a reduction. As we held above, the appropriate standard is whether MCTA bears a reasonable relationship to a legitimate government purpose. To prevail in a facial challenge, the class plaintiffs bear the burden of "establish[ing] that no set of circumstances exists under which [MCTA] would be valid." *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). None of the six reasons the district court found MCTA facially unconstitutional under the strict scrutiny review survives the reasonable relationship review.

Reasonable relationship review is highly deferential to the legislature. No one can reasonably dispute that Minnesota has a real, legitimate interest in protecting its citizens from harm caused by sexually dangerous persons or persons who have a sexual psychopathic personality. *See Addington*, 441 U.S. at 426, 99 S.Ct. 1804 ("[T]he state ... has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill."). The question then is whether MCTA is reasonably related to this interest. The burden to prove the statute is not rationally related to a legitimate government interest is borne by the class plaintiffs, whereas the burden to show that a statute is narrowly tailored to serve a compelling government interest is borne by the state. *See FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 314–15, 113 S.Ct. 2096, 124 L.Ed.2d (1993) ("On rational-basis review, ... those attacking the rationality of the legislative

classification have the burden 'to negate every conceivable basis which might support it.'" (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973))); *Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005) ("The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." (citations omitted)).

The Minnesota Supreme Court has had opportunity to consider whether the then-applicable Minnesota commitment statute violated due process. In *In re Blodgett*, 510 N.W.2d 910, 916 (Minn. 1994), that court held, "[s]o long as civil commitment is programmed to provide treatment and periodic review, due process is provided. Minnesota's commitment system provides for periodic review and reevaluation of the need for continued confinement." The next year, the Minnesota Supreme Court heard *Call v. Gomez*, 535 N.W.2d 312 (Minn. 1995), and considered a due process challenge to MCTA. Referring back to *Blodgett*, the court held, "once a person is committed, his or her due process rights are protected through procedural safeguards that include periodic review and re-evaluation, the opportunity to petition for transfer to an open hospital, the opportunity to petition for full discharge, and the right to competent medical care and treatment." *Id*. at 318–19.

MCTA is facially constitutional because it is rationally related to Minnesota's legitimate interests. The district court expressed concerns about the lack of periodic risk assessments, the availability of less restrictive alternatives, and the processes for seeking a custody reduction or a release. MCTA provides "proper procedures and evidentiary standards" for a committed person to petition for a reduction in his custody or his release from confinement. *See Hendricks*, 521 U.S. at 357, 117 S.Ct. 2072. Any committed person can file a petition for reduction in custody. Minn.

Stat. Ann. § 253D.27(2). The petition is considered by a special review board consisting of experts in mental illness and at least one attorney. Minn. Stat. Ann. § 253B.18(4c)(a). That panel conducts a hearing and issues a report with recommendations to a judicial appeal panel consisting of Minnesota district judges appointed to the judicial appeal panel by the Chief Justice of the Supreme Court. Minn. Stat. Ann. §§ 253D.27(3)–(4), 253B.19(1). Through this process, the committed person "has the right to be represented by counsel" and the court "shall appoint a qualified attorney to represent the committed person if neither the committed person nor other provide counsel." Minn. Stat. Ann. § 253D.20. Appeal of the decision of the special judicial panel may be taken to the Minnesota Court of Appeals. Minn. Stat. Ann. §§ 253D.28, 253B.19(5). Finally, a committed person is entitled to initiate a new petition six months after the prior petition is concluded. Minn. Stat. Ann. § 253D.27(2).

We conclude that this extensive process and the protections to persons committed under MCTA are rationally related to the State's legitimate interest of protecting its citizens from sexually dangerous persons or persons who have a sexual psychopathic personality. Those protections allow committed individuals to petition for a reduction in custody, including release; therefore, the statute is facially constitutional.

*Karsjens*, 845 F.3d at 408–10.

The Eighth Circuit Court of Appeals then considered the standards related to an as-applied due process challenge. The court stated:

When it considered the proper standard to apply, the district court stated substantive due process protected against two types of government action: action that shocks the conscience or action that interferes with rights implicit in the concept of ordered liberty. The district court then proceeded to discuss how the state defendants' actions interfered with the class plaintiffs' liberty interests to be free from restraint and thus

was subject to a strict scrutiny analysis. The district court applied the improper standard to consider an as-applied challenge when it determined there were two types of government action that could violate the class plaintiffs' substantive due process rights.

Following the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), this court held to prevail on an as-applied due process claim, that the state defendants' actions violated the plaintiffs' substantive due process rights, the plaintiffs "must demonstrate *both* that the [state defendants'] conduct was conscience-shocking, *and* that the [state defendants] violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (*en banc*) (Bye, J., concurring and writing for a majority on this issue) (emphasis in original) (quoting *Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. 2258 (1997)). The district court, citing to a pre-*Lewis* decision of *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), used the former disjunctive standard and focused only on whether there was a fundamental right at issue, and having determined that there was a fundamental right at issue, the district court applied a strict scrutiny test to both the facial and as-applied challenges.

As indicated above, however, the court should determine both whether the state defendants' actions were conscience-shocking and if those actions violated a fundamental liberty interest. To determine if the actions were conscience-shocking, the district court should consider whether the state defendants' actions were "egregious or outrageous." *See Montin v. Gibson*, 718 F.3d 752, 755 (8th Cir. 2013) (quoting *Burton v. Richmond*, 370 F.3d 723, 729 (8th Cir. 2004)). To meet this high standard, we have explained that the alleged

substantive due process violations must involve conduct "so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Moran*, 296 F.3d at 647 (quoting *In re Scott Cnty. Master Docket*, 672 F.Supp. 1152, 1166 (D. Minn. 1987)). Accordingly, the district court applied an incorrect standard in considering the class plaintiffs' as-applied substantive due process claims.

*Karsjens*, 845 F.3d at 408. Applying that standard, the court found:

We agree with the state defendants that much of the district court's "as-applied" analysis is not a consideration of the application of MCTA to the class plaintiffs but is a criticism of the statutory scheme itself. For instance, the court found that the statute was unconstitutional as applied to the plaintiffs because the state defendants do not conduct periodic risk assessments. However, the class plaintiffs acknowledge that MCTA does not require periodic risk assessments but those assessments are performed whenever a committed person seeks a reduction in custody. The district court also found as-applied violations in aspects of the treatment received by the committed persons, specifically concluding that the treatment program's structure has been an "institutional failure" and lacks a meaningful relationship between the program and an end to indefinite detention. However, we have previously held that although "the Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." *See Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (alteration in original) (quoting *Elizabeth M. v. Montenez*, 458 F.3d 779, 788 (8th Cir. 2006)). Further, as the Supreme Court recognized, the Constitution does not

prevent "a State from civilly detaining those for whom no treatment is available." *Hendricks*, 521 U.S. at 366, 117 S.Ct. 2072. Nevertheless, as discussed previously, to maintain an as-applied due process challenge, the class plaintiffs have the burden of showing the state actors' actions were conscience-shocking and violate a fundamental liberty interest. *See Moran*, 296 F.3d at 651.

None of the six grounds upon which the district court determined the state defendants violated the class plaintiffs' substantive due process rights in an as-applied context satisfy the conscience-shocking standard. Having reviewed these grounds and the record on appeal, we conclude that the class plaintiffs have failed to demonstrate that any of the identified actions of the state defendants or arguable shortcomings in the MSOP were egregious, malicious, or sadistic as is necessary to meet the conscience-shocking standard. Accordingly, we deny the claims of an as-applied due process violation.

*Karsjens*, 845 F.3d at 410–11.

Following the decision of the Eighth Circuit Court of Appeals in *Karsjens*, the Federal District Court for the Eastern District of Missouri reconsidered its trial findings from the *Van Orden* case. First, the court characterized the findings of the Eighth Circuit Court of Appeals in *Karsjens*:

The Eighth Circuit first held that the district court applied the wrong standard of scrutiny to the plaintiffs' facial and as-applied substantive due process claims. *Karsjens*, 845 F.3d at 407. In particular, the Eighth Circuit held that "[a]lthough the Supreme Court has characterized civil commitment as a significant deprivation of liberty, it has never declared that persons who pose a significant danger to themselves or others possess a fundamental liberty interest in freedom from physical restraint." *Id*. (citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) and *Foucha*

*v. Louisiana*, 504 U.S. 71, 116, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting)).

The Eighth Circuit relied on *Jackson v. Indiana*'s "reasonable relation" test, as did this Court, and held that the proper standard of scrutiny to be applied to the plaintiffs' facial due process challenge was whether the statute "bears a rational relationship to a legitimate government purpose." *Id*. at 407–08. The Eighth Circuit concluded that the Minnesota statute, on its face, survived this highly deferential reasonable relationship review. *Id*. at 409.

With respect to the as-applied challenge, the Eighth Circuit held that the proper standard was to require the plaintiffs to demonstrate "both that the state defendants' conduct was conscience-shocking, and that the state defendants violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id*. at 408 (quoting *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (*en banc*) (Bye, J., concurring and writing for a majority on this issue)). To shock the conscience, the Eighth Circuit held that "the alleged substantive due process violations must involve conduct so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id*. (citing *Moran*, 296 F.3d at 647) (quoting *In re Scott Cty. Master Docket*, 672 F.Supp. 1152, 1166 (D. Minn. 1987)).

The Eighth Circuit held that the grounds upon which the district court relied in finding an as-applied due process violation could not satisfy the conjunctive standard applicable to such a claim. Accordingly, the Eighth Circuit denied relief on the as-applied claim. *Id*. at 410–411.

*Van Orden v. Stringer*, 262 F. Supp. 3d 887, 891–92 (E.D. Mo. 2017). The court then applied its interpretation of *Karsjens* and found:

> The Eighth Circuit clearly held that "to maintain an as-applied due process challenge, the class plaintiffs have the burden of showing the state actors' actions were conscience-shocking *and* violate a fundamental liberty interest." *Karsjens*, 845 F.3d at 410 (emphasis added). The Eighth Circuit further held that claims substantially similar to the ones alleged here do not implicate a fundamental liberty interest. Although these holdings raise troubling questions as to whether civil commitment statutes can ever be challenged on as-applied substantive due process grounds, they are binding on this Court. And they end the Court's inquiry because, according to *Karsjens*, without a fundamental liberty interest, Plaintiffs' as-applied claim fails no matter how shocking the state defendants' conduct.

> In any event, the Court cannot distinguish Defendants' conduct with respect to risk assessment and release from the conduct of the state defendants in *Karsjens*, which the Eighth Circuit definitively held was not conscience-shocking. Applying the standard used by the Eighth Circuit in *Karsjens*, the Court may have still held that, at the least, continuing to confine the aged and infirm who are undisputedly no longer dangerous shocks the conscience. But *Karsjens* precludes such a holding. There, too, the district court found that the state defendants continued to confine individuals known to no longer meet the criteria for commitment, but according to the Eighth Circuit, neither this nor any of the other actions taken by the state defendants was enough to shock the conscience.

> The Supreme Court has held that "substantive due process demands an exact analysis of circumstances" before determining whether conduct shocks the conscience. *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708. And as Plaintiffs correctly note, in *Lewis*, relied heavily upon by the Eighth Circuit in

*Karsjens*, the Supreme Court distinguished circumstances in which "actual deliberation is practical," such as a "custodial prison situation," from those in which "decisions [are] necessarily made in haste, under pressure, and frequently without the luxury of a second change," such as a prison riot or high-speed chase. *Id*. at 852–53, 118 S.Ct. 1708. The Supreme Court held that, in the former circumstance, "deliberate indifference can rise to a constitutionally shocking level," whereas in the latter, a "purpose to cause harm" is needed to shock the conscience. *Id*. at 852–53, 118 S.Ct. 1708.

The *Karsjens* opinion did not discuss this distinction when determining that the Minnesota defendants' conduct with respect to risk assessment and release of civilly committed individuals did not shock the conscience. *Id*. at 411. Nevertheless, the opinion "is controlling until overruled by [the Eighth Circuit] en banc, by the Supreme Court, or by Congress." *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 459 (8th Cir. 2008).

*Van Orden*, 262 F. Supp. 3d at 893–94.

## IV.    FACTUAL FINDINGS

### A.    Dr. Wilson's Report

The major factual change to the record since the court's prior order is the filing of the Rule 706 expert report.[6]

---

[6] I made lengthy findings of fact in my previous order. (docket no. 81, p. 5-23). Specifically, I made findings related to: 1) the history of civil commitment; 2) the treatment process at CCUSO; 3) the then named defendants; and 4) the plaintiffs. Those findings are incorporated herein by reference. One primary additional factual change is referenced by both experts, specifically that CCUSO has updated the nature of certain therapies available to plaintiffs. That this change has improved CCUSO's treatment options is not disputed by the parties. (*See* docket no. 129 at 1; docket no. 134-1, p. 1).

At the outset of his report, Dr. Wilson[7] explained how he collected his data and formed his opinions:

> The Evaluator was appointed by the Court on 04/25/2017, subsequent to which contacts were made by email with counsel for the plaintiffs and defendants. The Evaluator requested documentation, as noted in the next section, which was ultimately provided largely by counsel for the Defendants, both by email and on CD and flash drive. Included in these documents were the clinical records of the named plaintiffs.

> The Evaluator visited the CCUSO site in Cherokee, IA on two occasions, 05/29/2017 to 06/01/2017 and 07/25-26/2017. On each occasion, interviews were undertaken with both staff and patients. During the first site visit, the Evaluator was able to meet with all but one (Mr. Matlock) of the named plaintiffs, both collectively and individually. . . Upon arrival on the first day of the first visit, the Evaluator was provided with a full tour of the facility by the Deputy Superintendent, Mr. Wittrock. On the second day of the first visit, the Evaluator was invited to the all-staff meeting first thing in the morning. At this meeting, both clinical and safety/security staff discussed current issues, as well as issues or problems that occurred in the recent past and plans for future revisions to policy and practice. The meeting was productive and staff appeared motivated to speak their minds about a variety of topics – from patient issues to program adaptation (*e.g.*, new programming for special needs. Otherwise, the Evaluator was able to attend meetings with Clinical staff (full complement, as well as a subset of staff working on the Special Needs project) and Treatment Program Supervisors (TPS). . .

---

[7] Dr. Wilson's credentials were set out in prior filings. (*See* docket nos. 111, 113 and 114).

(docket no. 117, p. 4-14). Dr. Wilson also reviewed a detailed list of documents related to Iowa's civil commitment program. (docket no. 117, p. 4-14, 59-60).

Dr. Wilson's report contains an overview of the physical facilities at CCUSO, something the record was previously lacking. (docket no. 117, p. 17-18). The report discusses everything from the quality of outdoor green spaces to the food service.[8] (docket no. 117, p. 18). Additionally, the report discusses the history of clinical sex offender treatment, the currently used methods for treating, and the effectiveness of treatment over non-treatment for sex offenders. (docket no. 117, p. 21-38). Dr. Wilson summed up the field of sex offender treatment by stating:

> To date, few SOCC centers have released enough clients who
> have completed treatment to provide recidivism findings.

_____

[8] For example, Dr. Wilson, stated:

> Notwithstanding the age of the facility, it is neat and tidy. The
> grounds are pleasant, with trees, gardens, and large open
> spaces. However, patients of CCUSO are not allowed to
> access these spaces; they are confined to smaller outdoor
> recreation spaces within the secure perimeter. That said, the
> outdoor spaces are reasonable and provide opportunities for
> both exercise and other activities, including gardening.

(docket no. 117, p. 72). He also discussed other programs available at CCUSO:

> In addition to core program participation as outlined above,
> patients at CCUSO also have access to chaplaincy services,
> therapeutic and individualized recreation, education (e.g.,
> High School Equivalency Diploma [HSED], correspondence
> courses – contingent and treatment phase placement),
> vocational services (carpentry/woodshop, small gas engine
> shop, hobby craft/print shop, and psychoeducational
> programming focused on computer literacy and job
> readiness), and job search.

(docket no. 117, p. 50).

> Those centers that have offered research findings (e.g., FL –
> Carr et al., 2013; DeClue, 2016; Wilson et al., 2012) have
> found that rates of sexual reoffending in released SVPs are
> not particularly different from their non-SVP counterparts.
> Without greater numbers of releases from SOCC, coupled
> with research as to post-release outcomes, it is difficult to say
> with any certainty what the true rates of post-SOCC sexual
> recidivism might be.

(docket no. 117, p. 43).

Dr. Wilson outlined the basic intake procedure for patients who are committed to CCUSO:

> Once a person arrives at CCUSO, a comprehensive intake
> assessment is completed to determine psychological status and
> potential treatment targets. This assessment is to be completed
> within 30 days of admission . . . Recently, CCUSO has
> enhanced its evaluation of cognitive functioning as part of its
> fledgling special needs treatment track and unit (Bridges).
> Ongoing assessments inform treatment progress, and
> physiological evaluations/examinations are also an integral
> part of the program (e.g., polygraph, penile plethysmography
> [PPG], and sexual interest testing [AASI]). Specialized
> assessments may be conducted as dictated by individual
> patient presentation.
>
> Initial and ongoing assessment of dynamic risk factors is
> accomplished using the MIDSA, Abel Assessment of Sexual
> Interests (AASI-3, and now AB-id for Bridges participants),
> and penile plethysmography (PPG). Ongoing maintenance of
> change is also assessed using polygraph examinations.
>
> Annual evaluations are dictated by statute and must be
> submitted to the committing court for each patient. These
> evaluations are conducted under contract with an independent
> evaluator from Wisconsin. Annual evaluations are provided
> to the Attorney General's office and may be sent to other
> agencies, as appropriate. Although CCUSO contracts with an

> evaluator to conduct these assessments, patients may elect to retain their own experts. . .
>
> The CCUSO treatment program purports to be RNR-based and relies on strength-based approaches like the Good Lives model (GLM). The program also retains some aspects of the formerly popular treatment approach known as Relapse Prevention (RP). Although many aspects of the RP model have been identified as not ideal in the treatment of persons who have sexually offended, there are elements that can be useful in aiding patients in desisting from sexually inappropriate conduct. General universal treatment targets center on general and sexual self-regulation, attitudes supportive of sexual offending, intimate relationships, and social and community supports. These universal treatment targets align quite closely with many of the more popular measures of dynamic risk (e.g., Stable-2007, SRA-FV, SOTIPS) as described in Section 5.

(docket no. 117, p. 45-46). Dr. Wilson then reviewed the treatment phases at CCUSO; his findings were not different in any significant way than those I made in my earlier order, although the treatment handbook is continually updated and his findings reflect the most recent updates. (docket no. 117, p. 46-49). He specifically discussed the goals and techniques used in both the transitional release and release with supervision stages of treatment. (docket no. 117, p. 53-55, 66; *see also* docket no. 129, p. 8-12 and docket no. 134-1 at 4-5 (the parties' agreed factual statements regarding the transitional release and release with supervision programs)).

Dr. Wilson also outlined the disciplinary procedures pursuant to the CCUSO handbook, a topic that I weighed heavily in my prior order.

> The CCUSO Patient Handbook outlines rules, discipline, and reactive procedures, including description of a behavioral level system. . . Sanctions for all types of behavioral infractions (noted as "reactive procedures") are clearly

spelled out and inform patients as the possible outcomes of behavioral violations. . .

[I]t is clear that there is a range of options available to staff who wish to employ corrective actions with patients who violate facility rules and expectations. Although stringent responses are available, it would appear that there is an intent to employ reasonable alternatives when circumstances allow. However, in speaking with patients, there were various complaints suggesting that while lesser alternatives exist, TPS staff typically default to higher degrees of punishment. Patients reported a great deal of frustration regarding the difficulties they experience in achieving and maintaining higher behavioral levels; particularly referencing how BRs can negatively impact treatment placement. A suggestion made by some patients was to separate the treatment phase and behavior leveling systems, except in those instances where the behavioral infraction is clinically relevant (e.g., engagement in sexual misconduct). This suggestion has merit and should be contemplated by CCUSO administration.

Of some relevance, clinical staff reported that a lot of time in treatment groups is lost to debriefing BRs that may or may not be clinically relevant. They suggested that TPS staff be responsible for reviewing those behavioral infractions that are not specifically related to clinical issues. This seems reasonable. Additionally, clinical staff noted their appreciation for the efforts of PSS staff on the units, but raised concerns regarding data collection, suggesting that CCUSO Administration must make data collection a priority on the units. Given the importance of data in conducting functional behavioral analyses, which can be important in directing treatment focus, support for PSS data collection is recommended.

For their part, TPS staff reported that it is their intent to use a least restrictive approach to punishment and noted that sanctions are "clinically informed," including possible

treatment assignments or a review of dynamic risk factors, but not necessarily a drop in behavior level. They stated that CCUSO does not use administrative segregation and that patients are restrained or secluded only as a last resort – with no instances of seclusion being reported for 2017 to date. TPS staff said that "putting hands" on a patient (i.e., restraint) is a last resort intervention, with verbal de-escalation being the preferred approach. They also noted that the longest restraints are typically six minutes or less in duration. For patients who pose a risk to themselves or others, "comfort" or "ligature-proof" rooms are available. TPS staff were clear in stating that seclusion is never used for punishment purposes. . .

Overall, TPS staff impressed as being knowledgeable about both the theoretical models that underpin the CCUSO program (e.g., RNR) and were conversant in the applicable terms and language. They also appeared to be well-informed about the treatment program and its aims and intents. Clinical staff indicated that TPS staff are regular attendees at clinical meetings, but noted that PSS staff are not as involved. Clinical staff acknowledged that integration of TPS/PSS and clinical staff is the stated intent of CCUSO, but noted that this intent is sometimes not fully realized. For their part, patients interviewed for this evaluation also noted a tendency for TPS staff to be somewhat removed from day-to-day activities.

(docket no. 117, p. 61-63). Similarly, Dr. Wilson explained the behavioral levels at CCUSO, specifically the system of 'paying' patients depending on their level and requiring patients to 'pay' for goods and services. (docket no. 117, p. 63-65). However, Dr. Wilson criticized the method of using behavioral reports to impede a patients' treatment progress.

There appears to be some merit to the suggestion that behavior management options be explored so as to not unnecessarily

impede treatment progression because of patient difficulties that may not have much to do with treatment, per se.

(docket no. 117, p. 76, 77).  He also noted patient complaints.

> [P]atients suggested that most TPS staff tended to employ a correctional, military, or primarily law enforcement approach to their interactions with others.  Questions of bias were also raised, as well as a perceived lack of TPS presence on the units, which was echoed by clinical staff.  For their part, patients characterized interaction/cooperation between clinical and PSS/TPS staff as "incredibly poor."

(docket no. 117, p. 18-19).

As referenced above, Dr. Wilson found that the treatment options at CCUSO have recently improved:

> Documentation describing the CCUSO program indicates that it is founded in the principles of effective correctional interventions (i.e., Risk-Need-Responsivity).  Focus is on identification of dynamic risk factors (also described as long term vulnerabilities).  The treatment curricula are eclectic, but are largely cognitive-behavioral in nature.  It appears that a lot of new modules or approaches have been implemented in the last year.  While this is certainly encouraging, it will be important for the program to maintain its advancements and to make others as treatment methods for sex offenders continue to be developed.

(docket no. 117, p. 73-74).  Additionally:

> The sex offender treatment literature has recently included recognition of the role of adverse childhood experiences in the pathway to inappropriate sexual conduct (see Levenson, 2014; Levenson et al., 2014; Reavis et al., 2013).  In recognition of the potentially traumatic experiences many patients may have sustained, CCUSO has undertaken to provide Trauma Informed Care services.  This represents "cutting edge" service delivery and the program is to be

24

> commended for attending to this very important responsivity
> and potentially treatment interfering issue.

(docket no. 117, p. 51). Dr. Wilson noted that the treatment hours at CCUSO are improving and nearing a national average.

> By definition, most SOCC programs are high intensity and
> are adherent to the Risk principle. However, number of
> treatment hours per week varies by program, with some
> reporting as few as three hours per week while others report
> 20 hours per week (average is 11 according to the 2016
> SOCCPN survey). Superintendent Turner reported that the
> Iowa program used to have only three to five hours of service
> hours per week, but that it is now more than 13 hours on
> average. He reported a plan to attempt to extend services
> hours to 24 per week of process, individual, and
> psychoeducational programming.

(docket no. 117, p. 52-53). Additionally, "[t]he typical patient in treatment at CCUSO receives 14 hours of direct care per week, and the Superintendent has expressed a wish to add another 10 hours to this by expanding the cadre of available therapeutic options. According to the 2016 SOCCPN survey, this amount of treatment is slightly higher than the average offered by other SOCC programs across the country." (docket no. 117, p. 74). Dr. Wilson compared Iowa to similar systems in other states and found that:

> All but five of the 19 programs providing data to the 2016
> SOCCPN survey (Schneider et al., 2016) reported having a
> conditional release framework or other less restrictive option;
> however, this does not mean that those options are actually
> employed. For instance, some jurisdictions have both
> conditional release and less restrictive options, but rarely
> employ them (e.g., MN). Some states (e.g., FL) have no
> formal post-release strategy and a majority of residents
> returned to the community have no mandated supervision or
> treatment (some residents may have residual terms of
> probation to complete). Other programs have less restrictive
> options and/or including conditional release (e.g., VA, WI)

or direct placement of civilly managed persons to the community (e.g., NY, TX). . .

Iowa is currently identified in the SOCCPN survey as a state with a conditional release framework, as discussed elsewhere in this report. As one of the smaller SOCC programs in the nation, the discharge or conditional release numbers from Iowa are not large. In 2016, 14 individuals were identified as having been conditionally released since the inception of the program in 1998, with a similarly small number of individuals having also been unconditionally discharged. As is the case with many SOCC programs, it is likely that a percentage of CCUSO patients could be released to the community without incident; however, the means by which to identify them can present challenges. . .

From a review of data provided to the 2016 SOCCPN survey, it would appear that Iowa's rate of SOCC per capita is not particularly different from most programs across the country, if not somewhat lower. From these data, it would be difficult to suggest that Iowa has a greater tendency on average to civilly commit sex offenders than other SOCC jurisdictions.

(docket no. 117, p. 66-68, 71).

Dr. Wilson observed other favorable developments at CCUSO.

In general, CCUSO does not have specialized units, *per se*, although development of a unit for special needs patients (e.g., intellectual disabilities and cognitive limitations) was in the middle of implementation during the second visit (07/24-25/2017). The assignment of patients to this unit represents a further step in CCUSO's attempts to establish a specialized curriculum for special needs patients. This is in keeping with similar units established in other SOCC centers and signifies an important improvement in patient care. During the second visit, the evaluator was able to visit the unit and speak with staff and patients on the new Bridges unit. It was clear that the patients had taken ownership of the unit, having put up posters, notices, and other accoutrements intended to denote a degree of unit cohesion. Patients interviewed by the

> Evaluator were happy to be on their own unit – sometimes in order to avoid bullying or the like by stronger non-disabled patients.

(docket no. 117, p. 17). However, Dr. Wilson later noted that the criteria used to identify special needs patients needs to be improved. (docket no. 117, p. 55). He went on to say:

> At this point, the Bridges program and unit are very new and, as such, it is difficult to comment on how well the responsivity needs of involved patients are being met. It is to be expected that revisions to policies and practices will need to be ongoing, as staff and patients become more familiar with the processes. It is recommended that the Bridges clinical team continue to explore eligibility criteria (beyond IQ testing) and expand their understanding of best practices in working with patients with these issues. To summarize, the institution of the Bridges program is an important and critical step forward for CCUSO, but long term investment in meeting the responsivity concerns of special needs clients will need to be maintained.

(docket no. 117, p. 59). He also noted that, while CCUSO has begun to identify special needs patients, other basic provisions, such as literature appropriate for a patient's intellectual level, is not necessarily provided. (docket no. 117, p. 77).

Dr. Wilson also discussed issues related to CCUSO staff members.

> CCUSO staff espouse a dedication to collaborative care and integration of clinical and safety/security concerns; however, individually, there was less adherence to the "party line," as it were.

(docket no. 117, p. 18). In his evaluation of the training of staff at CCUSO, another issue discussed in my previous order, Dr. Wilson stated:

> All staff are required to attend both induction training at CCUSO and yearly update training. Additionally, staff are expected to attend specialized training in working with sex offenders as provided through the Iowa Board for the

> Treatment of Sexual Abusers (IBTSA). Staff are also required to be members of IBTSA. . . Superintendent Turner reported that CCUSO has been working to ensure appropriate licensure and credentialing for clinical staff. Presently, most clinical staff are MSW or LP and are either licensed or license eligible. Staff qualifications and licensure is an important aspect of quality assurance. As such, it is recommended that CCUSO Administration continue to ensure appropriate licensure for all staff performing clinical services with patients.

(docket no. 117, p. 19-20). He also approved of the manner in which CCUSO collects documentation related to treatment.

> Overall, clinical documentation is of the sort that one would expect to find in a high intensity sex offender treatment program. As the Evaluator reviewed only clinical documentation as provided on flash drive by defense counsel, it is difficult to comment on the completeness of each client's clinical record. The Evaluator's experience as a clinical administrator suggests that maintaining complete and timely clinical records can be a challenge for most programs; especially those with unfilled staff positions. This is something for CCUSO Clinical Administration to be mindful of.

(docket no. 117, p. 61).

Also relevant is Dr. Wilson's finding that CCUSO has failed to develop programs specific for those with severe anti-social issues. (docket no. 117, p. 77).

> About two-thirds of SOCCPN member programs report inclusion of specialized programming for clients with behavioral issues or psychopathy. Some of those programs use ancillary groups focusing on antisocial values and attitudes while others offer specialized treatment tracks. At present, CCUSO does not have a specific plan for managing clients with highly entrenched antisociality.

(docket no. 117, p. 56). Similarly, Dr. Wilson found that a lone ARNP with psychiatric experience is likely not adequate considering the number of patients with mental health issues. (docket no. 117, p. 79). Dr. Wilson also faulted CCUSO for having, "no formal process for independent, external review of its policies and practices." (docket no. 117, p. 80). Also,

> Superintendent Turner reported that there is no plan to seek program accreditation for CCUSO (e.g., JCAHO, CARF). At present, there is no process of external review aside from that completed for the purposes of this evaluation.

(docket no. 117, p. 20). According to Dr. Wilson, the staff agreed that further psychological education needed to be developed at CCUSO.

> In discussions with clinical staff, it was noted that additional psychoeducational program options need to be developed for CCUSO patients. The Staff Treatment Manual identifies adjunctive therapeutic options such as life skills, social skills, self-regulation skills, etc., as well as psychoeducational options (relapse prevention, emotional regulation, personal victimization, anger management, etc.); however, no program materials appear to exist regarding these options. Elsewhere in this report, the Evaluator noted a lack of program documentation regarding alcohol and substance abuse issues; although this dynamic risk variable is considered in biopsychosocial assessments.

(docket no. 117, p. 51). Another issue that could be improved is staffing and therapy allocation.

> CCUSO employs a mix of group and individual treatment to accomplish its mandate. The majority of programming occurs in group, but one-to-one counseling is also employed to address individualized patient concerns. Both clinical and safety/security staff identified a need to remain true to RNR prescriptions; however, clinical staff raised concerns regarding implementation. Specifically, staff shortages were

noted as having an impact on the program's ability to offer treatment according to best practice standards, as set out in the CCUSO Staff Treatment Manual. Superintendent Turner reported that attention to filling empty positions has been a priority, but noted some degree of frustration in being able to attract and retain qualified applicants. He reported that all PSS vacancies are currently filled, but acknowledged that some clinical positions remain unstaffed.

The Staff Treatment Manual notes that process group size is typically one therapist for every 12 participants, "unless staff shortages necessitate a higher ratio." Although this is not dissimilar from other SOCC programs (SOCCPN survey data show a trend over the past few years of increasing average group size, from nine in 2013 to 12 in 2016), it is worth noting that SVPs are atypical treatment participants who often have a multitude of dynamic risk factors and personality challenges. As such, and in consideration of facility administrative concerns, it is recommended that attempts be made to cap group size at 10 and to explore options for co-facilitation. In discussions with treatment staff, concerns were expressed regarding caseloads, group size, and over-reliance on individual psychotherapy. Clinical staff also complained that case management ratios have slowly climbed as staff shortages have persisted and the program's census has grown. They expressed a belief that a 1:15 ratio was the program standard, but some clinicians current [sic] have 1:25. This has implications for service delivery in that Master Treatment Plans are apparently time-intensive and some clinicians have had to cut down on the number of groups because they are overwhelmed.

(docket no. 117, p. 51-52).

Based on those observations, Dr. Wilson concluded:

[I]t is apparent that a lot has changed at CCUSO in the past year to eighteen months; specifically, in regard to a broader

range of treatment perspectives and opportunities, greater adherence to the principles of Risk-Need-Responsivity (particularly responsivity), and updating aspects of the program to be in line with contemporary prescriptions with respect to offering best practice interventions for persons who have sexually offended. The Evaluator suspects that had he visited the program a year or more ago, the resultant evaluation might not have been as favorable. At this point, it appears that CCUSO has made great strides towards ensuring adequate treatment for its patient population; however, procedural issues remain regarding transition and opportunities for release, clear enunciation of targets patients must achieve to ensure continued advancement through the program, and ensuring a full staff complement that is fully aware of the programs [sic] goals and intents.

(docket no. 117, p. 75).

### B. Dr. Schlank's Report

Defendants submitted an expert report from Dr. Anita Schlank.[9] According to her report, Dr. Schlank conducted a review similar with that of Dr. Wilson. Specifically, Dr. Schlank made two visits to the CCUSO facility, interviewed both patients and staff, and reviewed documents related to both the plaintiffs and the CCUSO treatment regime. (docket no. 128-1 at 131).

Dr. Schlank's observations regarding the CCUSO facility were similar with those of Dr. Wilson. (docket no. 128-1, p. 132). Dr. Schlank also observed that:

Like other SVP programs, patients receive a patient handbook that clearly outlines the rules and expectations for the

---

[9] Dr. Schlank is currently the clinical director of the Virginia Center for Behavioral Rehabilitation in Burkeville, Virginia. She has a long history working in the field of sex offender treatment, including working with the Minnesota sex offender program. (*See* docket no. 128-1 at 144). She has also consulted with numerous civil commitment programs. (*Id.*, p. 147-148.)

program. Consistent with other SVP programs, CCUSO's program is multidisciplinary, with the majority of sex offender treatment provided through Process groups and topic- focused module groups, although individual therapy sessions are also used. The program combines elements from several models, and is based on the Risk-Needs-Responsivity Principles, with the majority of the treatment focused on criminogenic needs. Accommodations and alterations to the presentation of material are made for those who have different learning styles. The group facilitators, treatment program supervisors and direct care staff observed during the site visits all interacted with the patients in a professional and respectful manner, an impression supported by the responses by patients during interviews. Those interviewed and observed facilitating groups appeared to be genuinely motivated to provide the best treatment for the patients, and the groups observed were an appropriate and manageable size. Consistent with other SVP programs, (and as recommended as a minimum standard (Marques, 2001), treatment at CCUSO is offered in distinct phases, with objectives outlined for each phase. Some of the phase goals had clear timelines, while others did not. While it is preferable to be extremely clear to both therapists and patients regarding how long behavioral goals must be maintained, the data regarding the percentage of patients that get promoted in phase level each quarter suggested that the lack of time lines for some goals was not interfering with patients' ability to progress through the phases. Staff to patient ratios were good, at about one therapist to fourteen patients.

The treatment providers in CCUSO all had appropriate degrees, and had received training in important areas. The staff reported that they had been without a Clinical Director for two years prior to my first site visit, and seemed appreciate [sic] of the addition of the new Clinical Director. All SVP programs struggle with staff retention due to the high level of stress involved in the positions, and relatively low

salaries offered, and CCUSO experiences some of the same concerns. However, their turnover rate was not significantly different from other programs. In fact, the turnover rate of the direct care staff was significantly lower than many SVP programs . . .

(docket no. 128-1, p. 132).

Dr. Schlank also focused on the transitional and release with supervision portions of the Iowa civil commitment program:

CCUSO has a transition stage in which patients take on increased responsibilities and enjoy increased freedom, including the opportunity to plan and cook some of their own meals. In addition, they have the opportunity to hold a job in the community and attend that job unescorted (but with GPS monitoring). This type of "step down" phase is highly recommended for this population, given the lengthy time most had been incarcerated prior to an additional lengthy period of time civilly committed (Schlank & Bidelman, 2001).

CCUSO also contracts with probation officers to provide supervision for patients who have been released, but are still under supervision. These supervising agents conduct home plan investigations, order urine screens, and arrange for polygraph evaluations. Often the probation officers participate in the outpatient sex offender treatment groups with offenders on their caseload. Approximately 20% of total patients committed have now been discharged to supervised release, and some patients have been fully discharged with no supervision, demonstrating that there is a clear "path out" of commitment.

(docket no. 128-1, p. 133). Dr. Shlank also praised the newly developed special needs programs and the vocational programs offered at the CCUSO facility. (docket no. 128-1, p. 134-35).

Dr. Schlank generally agreed with Dr. Wilson regarding particular treatment deficiencies in the CCUSO program, including a need to improve treatment documentation. (docket no. 128-1, p. 133). Similarly, Dr. Schlank agreed, while group therapy at the CCUSO facility is generally positive, the program should embrace a wider array of therapy paths:

> While many programs throughout the United States still appear to use this cycle, it would be more effective if varying pathways to offending were recognized, as adherence to the cycle model could also lead to assumptions that offenders are ready to work on relapse prevention before they are truly motivated to do so, and could also lead to them offering information because they believe it is what is expected of them rather than because it makes sense as related to their personal history of offending.

(docket no. 128-1, p. 134). Additionally,

> The more psychoeducational, topic-focused groups did have clear objectives, but most did not have structured facilitator guidelines to be followed. Facilitators reported that they were expected to put together their own guidelines, and one facilitator noted that this led to a lack of consistency in how these groups were run. While this lack of facilitator guidelines is not entirely unusual for SVP programs, it is recommended that the guidelines be developed for consistency and to provide more guidance for inexperienced therapists.

(docket no. 128-1, p. 134). Dr. Schlank noted that CCUSO's treatment time could be increased to bring it in line with national averages. (docket no. 128-1, p. 133).

Dr. Schlank did not compare CCUSO's statistics with other programs in the same manner as Dr. Wilson, but did find that:

> A review of CCUSO's dashboard data shows that, like other SVP programs, CCUSO's patients are distributed with the majority of patients in the middle phases of the program. Data

indicates that; on average, approximately 3% of eligible
patients increase in phase each month, and less than 1% are
demoted in phase. Approximately three-fourths of patients
have work assignments, and approximately half of those in
the transition unit have outside employment. Staff turnover
rates are not higher than other programs, but group
cancellation rates were a bit high, at approximately 22%.

(docket no. 128-1, p. 136). Dr. Schlank concluded:

In my professional opinion, the program's practices and
policies regarding the provision of treatment do not constitute
inhumane treatment, are not unnecessarily punitive or
restrictive, and do not substantially depart from accepted
practice, judgment and/or standards in the field of residential
sex offender treatment.

(docket no. 128-1, p. 132).

## V. ANAYLSIS

### A. The Parties' Arguments

As noted above, three issues remain in this case following the prior motion for
summary judgment: 1) does CCUSO's treatment program violate the constitutional
"shock the conscience" standard; 2) is CCUSO's application of Iowa Code § 229(A)
punitive; and 3) are the procedures at CCUSO the least restrictive alternative for
committing sexual offenders.

Defendants' arguments are straightforward. They argue that there are no
remaining disputes in light of the *Karsjens* decision and expert reports. Regarding
plaintiffs' as-applied due process argument, defendants state:

Plaintiffs cannot show that Defendants [sic] conduct was
conscience-shocking or that the Defendants violated any of
Plaintiffs [sic] fundamental rights. The *Karsjens* court
decided that facial challenges to SVP legislation requires [sic]
the statute to bear a rational relationship to a legitimate
government purpose. *Id*. at 407-08. On an as-applied

challenge, like is before the court here, the Eighth Circuit held Plaintiffs must demonstrate "***both*** that the state defendants' conduct was conscience-shocking, ***and*** that the state defendants violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 408 (emphasis supplied). To shock the conscience, "the alleged substantive due process violations must involve conduct so severe[,] so disproportionate to the need presented, and so inspired by malice of sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhuman abuse of official power literally shocking to the conscience." *Id.* (citing *Moran v. Clark*, 296 F.3d 638, 651 (8th Cir. 2002)).

(docket no. 127-1, p. 5). Defendants argue that, even if I identified a fundamental right in this case, relying on the unrebutted expert evidence discussed above, the plaintiffs cannot show a question of fact on the "shocks the conscience" standard.

Regarding the question of whether CCUSO is punitive, defendants argue that the unrebutted expert testimony is that CCUSO is not punitive in nature. Defendants argue that prior cases, specifically *Taft v. Ryan*, C11-4021-DEO (N.D. Iowa 2014) and *Swanson*, 737 N.W.2d at 307, have approved the commitment system as rationally related to a legitimate purpose. Finally, defendants argue that there is no constitutional right to a less restrictive alternative. Because the plaintiffs cannot maintain their claims in light of *Karsjens* and the weight of the expert evidence, defendants argue that plaintiffs are not entitled to injunctive relief and their claims must be dismissed.

Plaintiffs, obviously, disagree with defendants' characterizations. First, the plaintiffs argue that the Eighth Circuit Court of Appeals's decision in *Karsjens* is simply

incorrect.[10] Plaintiffs argue that the Eighth Circuit Court of Appeals misapplied Supreme Court precedent and that the professional judgment standard articulated in *Youngberg v. Romeo*, 457 U.S. 307 (1982) should control this case. The plaintiffs then go on to make the grounded argument that this case implicates a fundamental liberty interest and they have created a factual issue on whether CCUSO's system shocks the conscience such that summary judgment is not appropriate even in light of the *Karsjens* decision. Citing *Jackson*, 406 U.S. at 715, plaintiffs claim a fundamental interest both in physical liberty and a requirement that the nature of a commitment must be related to the purpose of the commitment. In their argument that conditions at CCUSO shock the conscience, are punitive, and are not the least restrictive alternative, the plaintiffs largely rely on my prior ruling.[11]

## B.      *As Applied Due Process Challenge in light of* Karsjens

### 1.            *Fundamental Liberty Interest*

Since the earliest stages of this case, plaintiffs' strongest argument was an as-applied due process challenge to the treatment provided by CCUSO. (*See* docket no. 51,

---

[10] As set out below, I do not completely disagree with this argument. However, the *Karsjens* decision is binding until such time it is reversed by the Eighth Circuit Court of Appeals sitting *en banc* or by the Supreme Court.

[11] The plaintiffs also argue that different standards should apply to different plaintiffs depending on their level in the program. However, there is no support for that type of distinction in any of the Eighth Circuit cases related to civil commitment. Additionally, as the plaintiffs themselves concede, "as set forth in *In re Det. of Wygle*, 910 N.W.2d 599, 2018 WL 1769293 at *9 (Iowa 2018), there is no doubt that those on release, but not discharged, are still 'committed'." (docket no. 134-3, p. 10). Accordingly, I find no grounds to apply different standards to different plaintiffs.

p. 14).  Unfortunately for the plaintiffs, that claim has been rendered futile by the Eighth Circuit Court of Appeals's decision in *Karsjens*.

As set out above, the *Van Orden* court in Missouri promptly dismissed that case following the decision in *Karsjens*.  In its order, the *Van Orden* court focused on the Eighth Circuit Court of Appeals's statement that an as-applied due process claim requires a showing of both a previously identified fundamental liberty interest and conduct that shocks the conscience.[12]  The court found that the Missouri patients had not alleged a fundamental liberty interest and dismissed the case.  *Van Orden*, 262 F. Supp. 3d at 893, stating:

> The Eighth Circuit clearly held that "to maintain an as-applied due process challenge, the class plaintiffs have the burden of showing the state actors' actions were conscience-shocking and violate a fundamental liberty interest." . . . The Eighth Circuit further held that claims substantially similar to the ones alleged here do not implicate a fundamental liberty interest. . . [The holding ends] the Court's inquiry because, according to *Karsjens*, without a fundamental liberty interest, Plaintiffs' as-applied claim fails no matter how shocking the state defendants' conduct.[13]

While that rationale is straightforward, I do not believe it is the best way to resolve the present case.  As the *Van Orden* court observed regarding *Karsjens*, "these holdings raise

---

[12] In my previous order I, like the *Van Orden* court, applied the conscience shocking standard to plaintiffs' as-applied due process claim.

[13] That court went on to state, "[i]n any event, the Court cannot distinguish Defendants' conduct with respect to risk assessment and release from the conduct of the state defendants in *Karsjens*, which the Eighth Circuit definitively held was not conscience-shocking." *Van Orden*, 262 F. Supp. 3d at 894.

troubling questions as to whether civil commitment statutes can ever be challenged on as-applied substantive due process grounds." *Van Orden*, 262 F. Supp. 3d at 893–94. Additionally, as noted by the *Van Orden* court, the Circuit's seeming holding causes a circuit split:

> As Plaintiffs note, other circuits have appeared to treat the test as disjunctive. *See, e.g., Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) ("Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.' "); *Seegmiller v. LaVerkin City*, 528 F.3d 762, 768 (10th Cir. 2008) (holding that "the real issue in substantive due process cases [is]: whether the plaintiff suffered from governmental action that *either* (1) infringes upon a fundamental right, *or* (2) shocks the conscience," and that "the 'shocks the conscience' and 'fundamental liberty' tests are but two separate approaches to analyzing governmental action under the Fourteenth Amendment") (emphasis added).

*Van Orden*, 262 F. Supp. 3d at 894, fn.6. [14] Similarly, the Eighth Circuit Court of Appeals's facial due process ruling in *Karsjens* is not strongly rooted in Supreme Court precedent. As set out by the plaintiffs in this case:

> Plaintiffs respectfully disagree with [the Missouri court's] interpretation. *Karsjens* relied upon a statement made in a dissenting opinion in *Foucha v. Louisiana*, 504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992), and states that the Supreme Court "has never declared that persons who pose a significant danger to themselves or others possess a fundamental liberty interest in freedom from physical

---

[14] As noted above, in *Karsjens*, the Eighth Circuit Court of Appeals relied on *Moran*, 296 F.3d at 651 to find that both a fundamental liberty interest and shocking conscience conduct is required to make an as-applied due process claim.

restraint." *Karsjens v. Piper*, 845 F.3d 394 at 407. That does not end the inquiry, however. . .

> "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed. *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 1858, 32 L. Ed. 2d 435 (1972); *Seling v. Young*, 531 U.S. 250, 265, 121 S. Ct. 727, 736, 148 L.Ed. 2d 734 (2001).

(docket no. 134-3, p. 5-6). Put another way, it is hard to reconcile the Eighth Circuit Court of Appeals's ruling with this undisturbed Supreme Court precedent:

> "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones, supra*, 463 U.S., at 361, 103 S.Ct., at 3048 (internal quotation marks omitted). We have always been careful not to "minimize the importance and fundamental nature" of the individual's right to liberty. *Salerno, supra*, 481 U.S., at 750, 107 S.Ct., at 2103.

*Foucha*, 504 U.S. at 80. In *Foucha*, the Supreme Court found that a state could not continue to detain a properly committed individual when his mental illness had passed. The court, relying in part on the above quoted citations, found that doing so would violate due process. That holding seems relatively straightforward. In *Hendricks*, 521 U.S. at 357, the court noted that some states allow involuntary civil commitment of people, like sex offenders, who are found to be unable to control their behavior and pose a threat. Accordingly, the court found that "[i]t thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." *Id*. Again, a straightforward holding. However, this case, like both *Karsjens* and *Van Orden* asks a different question: whether a fundamental interest is violated when a state uses civil commitment to impair a person's ability to overcome their mental infirmity. Because, at its core, that is what the state does when it provides

detained patients so little treatment that the lack of treatment shocks the conscience. Nothing in the precedent of the Supreme Court answers that question, and certainly not with the certainty the *Karsjens* opinion would suggest.

This case can be decided without getting into the problematic reliance by the Eighth Circuit Court of Appeals on *Moran* to find plaintiffs must allege both a previously identified fundamental liberty interest and conscience shocking conduct, both because the present case fails on the conscience shocking standard alone and because the *Karsjens* court did not actually address the fundamental liberty interest issue in its disposition of that case. When it came to the actual analysis of the as-applied challenge, the Eighth Circuit Court of Appeals focused solely on how the conduct of the Minnesota commitment program did not shock the conscience. As quoted above, the conclusory paragraph in *Karsjens* states in full:

> None of the six grounds upon which the district court determined the state defendants violated the class plaintiffs' substantive due process rights in an as-applied context satisfy the conscience-shocking standard. Having reviewed these grounds and the record on appeal, we conclude that the class plaintiffs have failed to demonstrate that any of the identified actions of the state defendants or arguable shortcomings in the MSOP were egregious, malicious, or sadistic as is necessary to meet the conscience-shocking standard. Accordingly, we deny the claims of an as-applied due process violation.

*Karsjens*, 845 F.3d at 410–11. Thus, because the Eighth Circuit Court of Appeals avoided the fundamental liberty interest issue it had previously alluded to, I will do the same.

### 2. *Shocks the Conscience*

The Minnesota district court found that Minnesota's civil commitment system violated due process for six reasons.

> (1) Defendants do not conduct periodic independent risk assessments or otherwise evaluate whether an individual continues to meet the initial commitment criteria or the discharge criteria if an individual does not file a petition; (2) those risk assessments that have been performed have not all been performed in a constitutional manner; (3) individuals have remained confined at the MSOP even though they have completed treatment or sufficiently reduced their risk; (4) discharge procedures are not working properly at the MSOP; (5) although section 253D expressly allows the referral of committed individuals to less restrictive alternatives, this is not occurring in practice because there are insufficient less restrictive alternatives available for transfer and no less restrictive alternatives available for initial commitment; and (6) although treatment has been made available, the treatment program's structure has been an institutional failure and there is no meaningful relationship between the treatment program and an end to indefinite detention.

*Karsjens*, 845 F.3d at 402–03. For lack of a better term, Minnesota's treatment program was worse than Iowa's system in each of the six areas.[15] With the benefit of the present record, it is clear that plaintiffs' as-applied due process challenge fails as a matter of law.

The first ground cited in the *Karsjens* case was a lack of meaningful review of patients' cases.[16] Iowa's civil commitment program has never suffered from that problem, as the implementing statute directs annual judicial review.

> A person committed under this chapter shall have a current examination of the person's mental abnormality made once every year. The person may retain, or if the person is indigent and so requests, the court may appoint a qualified expert or

---

[15] That is true even on the record as it existed in this case from 2016.

[16] Although the claims in the Minnesota case and the present case do not use the exact same language, they do cover the same issues. Accordingly, I find the six findings from *Karsjens* a useful tool to analyze the remaining claims in this case.

> professional person to examine such person, and such expert
> or professional person shall be given access to all records
> concerning the person.
>
> The annual report shall be provided to the court that
> committed the person under this chapter. The court shall
> conduct an annual review and, if warranted, set a final hearing
> on the status of the committed person. The annual review
> may be based only on written records.

Iowa Code § 229A.8(2)-(3). There is no evidence that plaintiffs have been unable to access judicial review.[17]

The second factor from the *Karsjens* case was a lack of meaningful risk assessments. On the record presently before the court, it is clear that while CCUSO's system is not perfect, they have worked to develop a meaningful risk assessment standard. Dr. Wilson noted that the risk assessment tools used at CCUSO, "align quite closely with many of the more popular measures of dynamic risk (e.g., Stable-2007, SRA-FV, SOTIPS). . ." (docket no. 117, p. 45-46). Dr. Wilson's report related to risk assessment is not rebutted by anything in the record and is supported by Dr. Schlank's findings.

The third and fourth deficiencies from *Karsjens* related to patient discharge from commitment. In Minnesota, individuals completed the treatment program, but remained confined. In Iowa, the situation is different. When this case was first filed, virtually no patients had been released from CCUSO. However, Iowa's statistics have improved with

---

[17] As noted in the defendants' brief, "Plaintiff Matlock has successfully availed himself of both the treatment and legal process to the point that he has discharged the program." (docket no.127-1, p. 13). Additionally, the defendants' very well put together appendix (docket no. 129-1 – 129-11) contains the annual review record for each named plaintiff.

each passing year.[18]   As of the most recent filings, the population at CCUSO is approximately 115 individuals, with at least fifteen patients having reached the release with supervision stage.   (docket no. 117, p. 70; docket no. 128-1, p. 159).   These numbers do not represent an overwhelming success rate.   However, even a marginal success rate is superior to that of Minnesota – and that program, where virtually no one from a much larger population was ever released – was found by the Eighth Circuit Court

---

[18] As noted in my prior order, this case is only for prospective injunctive relief.  There is no doubt in my mind that the CCUSO program evaluated by Dr. Wilson and Dr. Schlank is a radically improved program from the one that existed when Judge O'Brien first granted the plaintiffs' application to proceed *in forma pauperis* in 2012.  Additionally, a simple review of the yearly statistics makes it clear that the existence of this case likely inspired the defendants to make releasing patients who had progressed through all treatment stages a higher priority.  As I set out in my prior order:

> Between 1998 and 2010, no patients successfully completed CCUSO's treatment program. . . CCUSO had eighty patients January 1, 2010.   Thirteen more were admitted in 2011, thirteen in 2012, four in 2013, five in 2014, and six in the first half of 2015.   On December 31, 2010, nine CCUSO patients were in transitional release and none in release with supervision.   On December 31, 2011, twelve were in transitional release and none in release with supervision.   On December 31, 2012, after Judge O'Brien originally allowed this case to proceed, thirteen were in transitional release and two were in release with supervision.   On December 31, 2013, eighteen were in transitional release and three were in release with supervision.  On December 21, 2014, after Judge O'Brien denied the defendants' motion to dismiss, fourteen patients were in transitional release and seven were in release with supervision.

(docket no. 81, p. 13).   However, the past wrongs are not relevant to the question of whether the plaintiffs have alleged a genuine fact issue that they are entitled to injunctive relief as of August 2018.

of Appeals to be constitutional. Additionally, both Dr. Wilson and Dr. Schlank agreed that, although CCUSO's treatment program has flaws, and some patients, including a number of the plaintiffs, feel hopeless about their chances for success, the treatment stages work. If a patient completes treatment, he is released. Dr. Schlank stated that approximately 3% of CCUSO patients advance to a higher treatment level each month. (docket no. 129-1, p. 136). Expanding that number out means that each year over a third of CCUSO patients advance to a higher phase of treatment. Again, although this is not a staggering success rate, it does show that the treatment progression is working at a higher rate than the system in Minnesota.

The fifth deficiency from Minnesota is specific to that state's statutory scheme and is not relevant to the present analysis. The sixth deficiency was, in essence, a total lack of effective treatment. Again, the record in this case clearly contrasts Iowa and Minnesota's civil commitment program, and shows that Iowa's program is superior to the one in Minnesota found constitutional in the *Karsjens* case.

My previous order set out numerous issues with CCUSO's treatment program. Those issues were based on the testimony of the plaintiffs, testimony of CCUSO employees, and a review of the relevant facility statistics. In particular, I noted testimony of CCUSO employees Steve Tjaden and Robert Stout, who both complained about the treatment provided to CCUSO patients. Tjaden stated:

> "I don't have time to do individual sessions at all now so everything is based on groups. We don't – we have such few therapists that we can't offer all the psychoeducation groups that are required, that I feel are needed." Mr. Tjaden was also asked how the individual sessions are helpful as opposed to the group sessions, and he responded "Well, some people don't participate very well in group. So if they're sitting in group and they're not really giving much input, I don't really know where they are. But if I'm sitting down with them one

> on one, I have a better sense of what they need, and then I
> can direct them to some activities that will help them grow."

(docket no. 79-2, p. 4).  Similarly, Stout testified:

> [B]ecause he had some background in psychology, he was
> asked to lead some psychiatric courses for patients.  As the
> number of therapists decreased and the number of patients
> increased, he was given more responsibility to not only do
> psychiatric education classes, but also to do therapy for
> patients.

(docket no. 79-2, p. 5).  I concluded my prior order by stating:

> Almost across the board, the defendants themselves testified
> that the quality of care at CCUSO has been declining, as the
> ratio of patients to staff reversed, the former constantly
> growing, the later constantly declining.  When considering
> that these patients will spend the rest of their lives locked
> away unless they receive quality care, these allegations
> certainly could shock the conscience.  Because the plaintiffs
> have made sufficient allegations that CCUSO's treatment
> could shock the conscience, the defendants' motion for
> summary judgment is denied.

(docket no. 81, p. 45).  Each of those findings is supported by facts in the record.

However, those prior findings must be viewed in light of the current record and
law.  When the facts are viewed in that light, the plaintiffs have failed to state a claim
that can survive summary judgment.  The *Karsjens* decision has set a very high bar for
plaintiffs looking to make an as-applied due process claim.  These plaintiffs cannot cross
that bar because the CCUSO program of 2018 provides better treatment than Minnesota
did at the time of the original *Karsjens* trial.  That finding is based on the view of two
experts, one for the court, one for the defendants, who have provided substantially similar
testimony that CCUSO's treatment program is at or above the national average and
individual patients have a path to release.  As Dr. Schlank found:

> [I]n my professional opinion, CCUSO does not appear to be inhumane or unnecessarily punitive or restrictive. The treatment provided is consistent with the accepted standards for residential sex offender treatment. It incorporates research- supported interventions and focuses primarily on criminogenic needs. There is a transitional unit in which patients earn increased privileges and demonstrate increased responsibility, including the ability to plan/cook their own meals and obtain outside employment while still on supervision. A contract exists with probation officers to provide supervision for those discharged, but on conditional release. Some patients have been fully discharged, demonstrating that there is a path to release. The staff members at CCUSO are qualified and appropriately trained, and voiced support for their administration. They appeared to treat the patients with respect, an impression which was supported by the interviews with the patients. All appeared genuinely dedicated to helping patients make progress that will allow them to safely return to the community.

(docket no. 129-1, p. 136). Dr. Wilson found:

> it is apparent that a lot has changed at CCUSO in the past year to eighteen months; specifically in regard to a broader range of treatment perspectives and opportunities, greater adherence to the principles of Risk-Need-Responsivity (particularly responsivity), and updating aspects of the program to be in line with contemporary prescriptions with respect to offering best practice interventions for persons who have sexually offended. The Evaluator suspects that had he visited the program a year or more ago, the resultant evaluation might not have been as favorable. At this point, it appears that CCUSO has made great strides towards ensuring adequate treatment for its patient population . . .

(docket no. 117, p. 75). The plaintiffs do not present any facts that seriously challenge those opinions.[19] Accordingly, I will grant the defendants' Motion for Summary Judgment on the as-applied due process challenge because the plaintiffs have failed to create a genuine fact issue that CCUSO's treatment program shocks the conscience. Because I grant summary judgment on the conscience shocking issue, I need not resolve the fundamental liberty interest issue discussed above.

## C.    *Whether CCUSO is Punitive and the Least Restrictive Alternative*

I allowed two additional claims to proceed in my prior order, whether Iowa's civil commitment system has become punitive and whether the treatment program used is the least restrictive alternative. In light of the factual record that has been developed, I must also grant the defendants' Motion for Summary Judgment on each of those claims.

In my prior ruling, I cited the original *Karsjens* district court decision and found that, "the record is replete with evidence that could tend to show CCUSO has become punitive." (docket no. 81, p. 48). I then discussed the behavioral report system used at CCUSO, and how behavioral reports could affect treatment progress. I concluded that

---

[19] The plaintiffs make compelling arguments that individual plaintiffs, such as Taft and Risdal, have never achieved success with CCUSO's treatment program despite a combined thirty years of civil confinement. (*See* docket no. 117-1, p. 1, discussing Taft's individual case; docket no. 129, p. 20, discussing Risdal's case). However, the failure of particular individuals to succeed in treatment is not evidence that the system shocks the conscience in light of the larger, positive, treatment trends discussed above. (If anything, the failure of particular plaintiffs to advance is more closely associated with the issue of whether the civil commitment system has become punitive.) Accordingly, as compelling as those arguments may be as related to individual plaintiffs, they do not change my conclusion that there is no genuine issue of material fact.

However, both experts agreed that one of CCUSO's primary failings is that it does not have a treatment program designed to accommodate special needs patients with profound psychological issues or who may be diagnosed as psychopaths. (*See e.g.*, docket no. 117, p. 55). While this failure does not alter my judgment in this case, it is a cause for concern that should be addressed by the defendants.

on the evidence then before the court, plaintiffs had created a fact question on whether the Iowa civil commitment system was punitive in nature. Again, nothing about my prior order misstated the record. However, subsequent developments have changed my conclusion regarding whether this case can be allowed to proceed. First, again, the *Karsjens* decision, including the Minnesota court's finding that the Minnesota program was punitive, was reversed by the Eighth Circuit Court of Appeals. Second, this record has been expanded to include expert testimony on this issue. The experts specifically found that although CCUSO has issues – including the use of behavioral reports to impact treatment progression – Iowa's civil commitment system is in line both with national averages and contemporary research regarding the effective treatment of sex offenders. Additionally, although I am not bound by the experts' opinions, they opined that Iowa's civil commitment is not punitive in nature (*See* docket no. 129-1, p. 132; docket no. 117, p. 75-76, where Dr. Wilson notes that, although there is merit to the critique that CCUSO should not use unrelated behavior reports to affect a patient's treatment progress, CCUSO's behavior management program is generally well established and proportional). Additionally, as noted by the defendants, CCUSO patients are given opportunities to challenge unfounded behavioral reports. (docket no. 127-1, p. 14). Based on the forgoing, there is no genuine issue of material fact and the plaintiffs' claim that the Iowa civil commitment system has become punitive must be denied.

For the same reasons, the plaintiffs' claim related to least restrictive alternative must be dismissed. I previously allowed this claim to proceed because both the *Karsjens* and *Van Orden* courts allowed similar claims to proceed to trial. Although both those cases went to trial, the plaintiffs' verdicts have now been overturned. In this case, the experts agree that Iowa's civil commitment system is in line with the programs in other states and is based on accepted medical standards. The plaintiffs have not alleged a viable less restrictive alternative, nor have they cited any case law which would allow these

claims to proceed to trial.[20]  (*See* docket no. 134-3, p. 17).  Accordingly, the defendants' Motion for Summary Judgment must be granted.

## *VI.    CONCLUSION*

For the reasons set out above, defendants' Motion for Summary Judgment (docket no. 127) is **granted** on plaintiffs' three remaining claims.  Accordingly, this case is hereby **denied** and **dismissed**.

Pursuant to Judge O'Brien's prior order (C15-4025-MWB, docket no. 5) the stays in related cases C15-4025-MWB and C15-4029-LTS are **lifted**.  Additionally, the claim raised in case C15-4025-MWB is **denied**, and that case is **dismissed**.[21]

Additionally, I want to applaud the hard work and dedication of counsel.  This case lasted nearly six years and has taken hundreds, if not thousands, of work hours. Counsel for both sides has performed admirably and ably at each stage of this litigation, and it is clear that the attorneys take seriously the profound constitutional issues which were at issue in this case.  I know I speak for both myself and the late Judge O'Brien when I say that your advocacy in this case has been a credit to the legal profession.  I also want to thank Dr. Robin J. Wilson for accepting appointment as the court's Rule 706 expert and his hard work preparing his report.

Finally, I ask the defendants to consider the recommendations contained in the two expert reports.  Some recommendations, such as the need to continue to develop treatment specific to special needs patients, were discussed above.  Other recommendations fell outside the scope of this order.  For example, Dr. Wilson recommended that treatment providers work to give patients realistic estimates regarding the timeline for treatment, as a means of combating hopelessness.  Dr. Wilson also suggested the formation of an

---

[20] Rather, plaintiffs rest their claim on my prior ruling.

[21] Because C15-4029-LTS has been assigned to Judge Strand, defendants are directed to file the appropriate dispositive motion in that case.

independent panel to review CCUSO policies. Both of those suggestions are low cost ways to continue the improvements that CCUSO has made during the course of this litigation. One final point. I thought Judge Donovan W. Frank was absolutely correct in his analysis of the constitutional issues in *Karsjens*. But like all federal trial court judges, I have an obligation to follow circuit precedent, even when I strongly disagree with it. That is one of the meanings of the rule of law and the oath of office I swore to uphold.

**IT IS SO ORDERED**.

**DATED** this 17th day of August, 2018.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA